# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SJUNDE AP-FONDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-1001-KSJM |
| | ) | |
| ACTIVISION BLIZZARD, INC., | ) | |
| ROBERT KOTICK, BRIAN KELLY, | ) | |
| ROBERT MORGADO, ROBERT | ) | |
| CORTI, HENDRIK HARTONG III, | ) | |
| CASEY WASSERMAN, PETER | ) | |
| NOLAN, DAWN OSTROFF, BARRY | ) | |
| MEYER, REVETA BOWERS, | ) | |
| KERRY CARR, MICROSOFT | ) | |
| CORPORATION, and | ) | |
| ANCHORAGE | ) | |
| MERGER SUB INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 9, 2025
Date Decided: October 2, 2025

Michael Hanrahan, Stacey A. Greenspan, Corinne Elise Amato, Kevin H. Davenport, Christine N. Chappelear, Kirsten M. Valania, PRICKETT, JONES, & ELLIOTT, P.A, Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, J. Daniel Albert, Lauren Lummus, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff Sjunde AP-Fonden.*

Edward B. Micheletti, Lauren N. Rosenello, Michelle L. Davis, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Counsel for Defendants Robert Kotick, Brian Kelly, Robert Morgado, Robert Corti, Hendrik Hartong III, Casey Wasserman, Peter Nolan, Dawn Ostroff, Barry Meyer, Reveta Bowers, and Kerry Carr.*

Elena C. Norman, Daniel M. Kirshenbaum, Y. Carson Zhou, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Stephen P. Blake, Laura Lin, Eric McCaffree, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California; *Counsel for Defendants Microsoft Corporation and Activision Blizzard, Inc.*

McCORMICK, C.

This stockholder class action arises from Microsoft Corporation's acquisition of Activision Blizzard, Inc., a deal negotiated under the cloud of breaking news of pervasive sexual harassment at Activision. Regulators began investigating sexual harassment at Activision in 2018. When they made their findings public in mid-2021, Activision's stock price plunged and Activision began hemorrhaging senior leadership. Tensions grew on November 16, 2021, when *The Wall Street Journal* published a scathing article titled *Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant.* Right after the story, Activision employees staged a walkout to force Kotick's ouster.

Microsoft was one of Activision's most important business partners, and Kotick had enjoyed a close relationship with numerous Microsoft executives for many years. The scandal, however, left Activision and its CEO weak and wounded. Activision's position created an opportunity for Microsoft to acquire the company at a discounted price. Two days after *Kotick Knew* ran, Microsoft publicly criticized Activision and announced that it was reconsidering the relationship. A few days later, Microsoft told Kotick that Microsoft was interested in acquiring Activision.

Kotick responded to Microsoft's acquisition overture by immediately convening a small group of directors and a financial advisor with whom he had longstanding ties. By November 26, 2021, the small group had determined a price range for a potential deal. The Activision board had approved a long-range plan on November 2, 2021, which included growth scenarios implying a price range of $113 to $128 per share. But the self-appointed small group set a negotiating range of $90 to $105 per

share, which Kotick relayed to Microsoft on November 28.  The next day, Microsoft agreed to negotiate within that range.

Then Kotick told the board what he had done.  During a meeting on December 3, 2021, Kotick told the board of his discussions with Microsoft.  The board then considered what a potential sale process might look like.  It is unclear whether the board authorized further negotiations with Microsoft.

Yet the process with Microsoft moved forward.  Microsoft entered into a non-disclosure agreement and received a copy of Activision's long-range plan on December 6.  Microsoft discussed the plan with Activision representatives on December 7.  Microsoft sent a non-binding indication of interest to Activision on December 10, proposing to acquire Activision at $90 per share.  By December 20, Microsoft and Kotick had agreed to $95 per share with a thirty-day exclusivity period.  That price was on the low end of the per-share price range that the small group had selected and below the range implied by growth scenarios in the board-approved long-range plan.  So management lowered its projections, allegedly to justify the deal price.

While engaging with Microsoft, Kotick spoke to other potential acquirors—some had reached out unprompted, and some were identified by the financial advisor.  But Microsoft had a major head start.  Discussions with other potential acquirors did not go far and were ultimately cut off by Microsoft's exclusivity agreement.

The board approved a draft merger agreement on January 16, 2022, a day before the exclusivity period expired, and the parties executed the merger agreement on January 18.  The deal removed Kotick's head from the chopping block—the

2

agreement included a key-man provision and broader liability protections than he enjoyed at Activision.

The parties anticipated a lengthy regulatory review process, with the merger closing in late 2023 or early 2024. The draft merger agreement, however, did not address the number or amount of dividends that Activision could pay while the merger was pending. Kotick negotiated this issue after the board approved the draft. The final merger agreement limited Activision to one regular cash dividend of not more than $0.47 per share.

Although the parties did not expect the deal to close before 2023 at the earliest, Activision scheduled a stockholder meeting to approve the merger for April 28, 2022. Approximately 68% of the voting power cast votes, with 98% voting in favor of the merger.

The regulatory approval process proved as extensive as anticipated. As it played out, Activision's finances improved. Activision announced exceptional quarterly results, with all three of its segments outperforming historical metrics, consensus estimates, and the wider industry.

The merger agreement included a July 18, 2023 termination date. On that date, the board executed a letter agreement that Kotick had negotiated with Microsoft. The agreement extended the termination date to October 18, 2023, eliminated Activision's right to collect a $3 billion termination fee, narrowed Activision's right to terminate the merger agreement, and eliminated or waived various conditions to closing. The agreement also allowed Activision to pay a one-

3

time dividend for fiscal year 2023 of $0.99 per share. Activision paid the dividend to certain shares of treasury stock.

Ultimately, the parties restructured the transaction in response to regulatory concerns. The merger closed on October 13, 2023.

The plaintiff owned Activision stock. It claims that Kotick and the Activision directors breached their fiduciary duties in connection with the merger. The plaintiff argues that the merger is subject to review under the entire fairness standard because a majority of the board was conflicted. Alternatively, the plaintiff argues that the merger is subject to enhanced scrutiny under *Revlon*, that the board failed to maximize stockholder value through the sale process, and that the stockholder vote was not sufficiently informed to give rise to *Corwin* cleansing. The plaintiff claims that Microsoft aided and abetted these fiduciary breaches. The plaintiff also claims that the decision to extend the termination date was itself a fiduciary breach.

Atop these claims, the complaint layers on claims for violations of the Delaware General Corporation Law. Boiled down, the plaintiff claims that the merger was such a rush job that the board failed to follow basic black-letter requirements of the DGCL. These statutory violations gave rise to independent fiduciary breaches, according to the plaintiff.

The parties agreed to bifurcate proceedings to address aspects of the plaintiff's statutory claims at the outset of the litigation. In an earlier decision, the court found it reasonably conceivable that the defendants violated multiple provisions of the DGCL when approving the merger. In response, Microsoft and Activision filed a new

4

action to validate the merger under Section 205 of the DGCL, and the court granted the relief sought. The plaintiff then amended its complaint, and the defendants moved to dismiss.

This decision resolves the motion to dismiss the now-operative complaint, making this a pleading-stage decision. Given the volume of litigation activity that preceded this decision, some might be surprised to learn that the case is still at the pleading stage. But it is. And that means that the court accepts the truth of the plaintiff's allegations, draws plaintiff-friendly inferences from those allegations, and asks whether it is reasonably conceivable that the facts and inferences support the claims asserted.

This decision denies the motion to dismiss plaintiff's core claim. Under the enhanced-scrutiny standard of review, which the defendants themselves advocate for, the plaintiff has stated a claim against Kotick and Activision's board for breaching their fiduciary duties. The plaintiff alleges that Kotick rushed Activision into a transaction with Microsoft to keep his job, secure his change-of-control payments, and insulate himself from liability, and that he tainted the sale process to secure these outcomes. All of these allegations are reasonably conceivable.

So too are the plaintiff's allegations against each director. As to the small group of directors who Kotick brought into the process before informing the board, it is reasonably conceivable that: Each knew of *Kotick Knew* and the employee protests, and that the company's stock was depressed as a result; each knew that the timing of the deal with Microsoft was bad for the company and good for Kotick; and each

5

knew that the board-approved plan contemplated a value of $113 to $128 per share. Yet none paused to question the wisdom of rushing into a deal with Microsoft. This makes it reasonably conceivable that the small group members placed Kotick's interests ahead of value maximization, and so the plaintiff has stated a non-exculpated claim against each of them.

The plaintiff also states a claim against the other directors who let Kotick run the process. Ultimately, only twelve days after first learning of Microsoft's overture, the board authorized Activision's sale at $95 per share. Given the board's awareness of Kotick's conflicts and the company's higher standalone value, these allegations make it reasonable to infer that they too approved a hasty sale of Activision at $95 per share to serve Kotick's interests rather than the best interests of the stockholders. That too would constitute bad faith, thus stating a non-exculpated claim.

For the same reasons, the plaintiff adequately alleges that the defendants breached their fiduciary duties when entering into the letter agreement. There, the defendants effectively doubled down on their prior breaches. If anything, it is reasonably conceivable that their decision at that point in the process was worse, because they had concrete evidence of Activision's strong performance.

The defendants' effort to dismiss the statutory claims meets mixed results. Some claims are viable. The plaintiff adequately alleges that allowing Kotick to negotiate the dividend provisions of the merger agreement after the board approved the agreement's form violated Section 141(c) and 251(b) of the DGCL. It is also reasonably conceivable that the defendants converted the stockholders' shares by

6

consummating a merger in violation of Sections 103 and 251 of the DGCL. But the other DGCL claims are dismissed. The claim that Activision violated Section 262 solely as a result of violating Section 251 does not work. Likewise, the plaintiff's novel theory that merely signing the merger agreement constituted an act of conversion fails as a matter of law.

There is one statutory claim that the court cannot adjudicate on the pleadings. The plaintiff asserts that the defendants violated the DGCL by paying dividends on treasury stock. To defeat the claim, the defendants relied on many documents outside the pleadings. That decision warrants converting their motion to dismiss into one for summary judgment. The plaintiffs can obtain discovery in opposition to the as-converted motion.

Although the plaintiff has adequately alleged a handful of statutory violations, those alleged violations do not support a freestanding claim for breach of fiduciary duty. There is no reasonable inference that the director defendants knowingly violated the DGCL in connection with the merger, even if it is reasonably conceivable that they breached their fiduciary duties in connection with the merger in other ways.

The plaintiff also fails to state a claim for aiding and abetting against Microsoft. The Delaware Supreme Court recently recalibrated the elements of a claim for aiding and abetting in *Mindbody*[1] and *Columbia*.[2] Those decisions emphasize that a claim of aiding and abetting requires multiple forms of scienter and

---

[1] *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349 (Del. 2024).

[2] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, --- A.3d ---, 2025 WL 1693491 (Del. June 17, 2025).

7

passage through a gauntlet of Restatement factors governing the element of substantial assistance. Those decisions also emphasize that a claim for aiding and abetting is particularly difficult to assert against a third-party acquiror like Microsoft, which enjoys some level of protection in negotiations with a potential target. The plaintiff fails to plead facts sufficient to meet this high bar here.

Litigation on the merits of a trimmed-down version of the plaintiff's complaint can now launch. Game on.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Verified Third Amended Class Action Complaint (the "Third Amended Complaint") and the documents it incorporates by reference.[3]

### A.    The Sexual Harassment Scandal

Activision (or the "Company") is a Delaware corporation headquartered in California that develops and publishes interactive entertainment content and services. Activision conducts its business through three subsidiaries, each of which develops and publishes high-quality games commonly referred to as "AAA" games. The three business subsidiaries are: (i) Activision Publishing, Inc., which houses the AAA marquee franchise *Call of Duty*; (ii) Blizzard Entertainment, Inc., which houses the popular *Diablo* and *Overwatch* franchises; and (iii) King Digital Entertainment, which houses *Candy Crush*. Activision stock previously traded on the NASDAQ.

---

[3] C.A. No. 2022-1001-KSJM, Docket ("Dkt.") 171 ("Third Am. Compl."). The Third Amended Complaint references and thus incorporates many Bates-stamped documents. Some were provided to the court; others were not. The court reviewed those that were provided. For the rest, this decision relies on the descriptions of and quotations from those documents found in the Third Amended Complaint.

Kotick was Activision's CEO and director at all relevant times. Kotick acquired a 25% stake in the Company in 1990. He became director and CEO in February 1991. He served as a director until the Activision merger closed and as CEO until December 29, 2023. He also served as Chair of the Board from 1991 to 2008.

In 2018, the U.S. Equal Employment Opportunity Commission (the "EEOC") and the California Department of Fair Employment and Housing (the "DFEH") began investigating Activision for company-wide sexual harassment, discrimination, and retaliation (the "Sexual Misconduct Issues"). After more than two years of investigation, on June 15, 2021, the EEOC issued a finding of reasonable cause that Activision violated Title VII of the Civil Rights Act of 1964 by exposing its employees to sexual harassment, discrimination, and retaliation. On June 24, 2021, the DFEH issued a finding that Activision violated the California Fair Employment and Housing Act and the California Equal Pay Act by exposing its employees to sexual harassment, discrimination, and retaliation.

Some executives left the Company after those findings. They included the CFO, Chief Legal Officer, and Senior Director of Securities and Corporate Governance.

Lawsuits ensued. On July 20, 2021, the DFEH sued Activision. That lawsuit triggered follow-on derivative suits and a class action against the Company and its officers and directors, including Kotick. Kotick hired a law firm to review the Company's practices and procedures relevant to the Sexual Misconduct Issues. The

9

same law firm appeared in several lawsuits on behalf of the defendants. On September 20, 2021, *The Wall Street Journal* reported that the SEC was investigating Activision. Ultimately, Activision would pay a $35 million penalty to settle the SEC's investigation. On September 27, 2021, the EEOC filed suit against Activision. The EEOC simultaneously filed a proposed settlement under which Activision agreed to pay $18 million to victims and implement remedial reforms. The trial court approved the EEOC's settlement and the DFEH appealed that approval.

More senior officers and managers resigned or were let go.

The Sexual Misconduct Issues, investigations, lawsuits, and intense media scrutiny adversely affected Activision's stock price. On July 21, 2021, Activision's stock price closed at $90.63. By September 27, 2021, it had declined to $76.64.

Kotick was kept at the helm of Activision despite the turmoil. In fact, in April 2021 while the EEOC and the DFEH were conducting their investigations, Activision's compensation committee extended Kotick's employment agreement from December 31, 2021 to March 23, 2024.

In an apparent effort to bolster employee trust, Kotick issued a letter to all employees on October 28, 2021, admitting that Activision had failed to put systems, policies, people, and guardrails in place to establish a safe and inclusive workplace. He also announced that he had asked the board to reduce his total compensation to $62,500 per year "until the Board [] determined that [Activision had] achieved . . . transformational gender-related goals and other commitments."[4]

---

[4] *Id.* ¶ 63.

**B.     The Board Approves The Long-Range Strategic Plan.**

On the day that Kotick made his salary-reduction announcement, Activision's Board of Directors (the "Board") met and discussed an 89-page document titled "Long-Range Strategic Plan" (the "Strategic Plan"). The Strategic Plan identified "leadership changes" as among Activision's biggest risks.[5] For Blizzard, the Strategic Plan prioritized "rebuild[ing] employee culture and trust" and "remov[ing] blockers of change – establish[ing] who is in and who is out."[6]

The Strategic Plan suggested that Activision's then-current $78.08 stock price did not reflect Activision's value. It recommended a share buyback at prices between $70 and $80 per share. The Strategic Plan included the following implied per share values for Activision: $128 per share for its "Preliminary Flat-out Case"; $113 per share for its "Preliminary Risked Case"; and $84 per share for its "No Growth Scenario."

The Board approved the Strategic Plan on November 2, 2021. The same day, Activision announced that it was delaying the release of two key products, *Overwatch 2* and *Diablo IV*. It is reasonably conceivable that the delayed releases were due in part to staffing turnover resulting from the Sexual Harassment Issues.[7]

Also on November 2, Activision announced that Jen Oneal was leaving the Company. She had been appointed co-leader of Blizzard just months earlier after

---

[5] *Id.* ¶ 66.

[6] *Id.*

[7] *See generally id.* ¶¶ 236–38.

11

high-level executives left due to the Sexual Misconduct Issues. Activision's stock price dropped another 14% that day to $66.75.

### C. Employees Demand Kotick's Resignation.

On November 16, 2021, *The Wall Street Journal* published *Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant.* That same day, current and former employees participated in a protest demanding that Kotick resign. Activision's stock price fell another 6%, closing at $66.14.

Employees circulated a petition demanding Kotick's resignation. Over 1,900 employees signed—almost 20% of the total workforce. More senior managers resigned or were terminated, including some identified as harassers whom Kotick had protected.

Sony and Microsoft were Activision's most important business partners. They provided the hardware platforms, digital platforms, and video game consoles that consumers used to play and pay for Activision's games. Those relationships gave them "influence" over Activision's "products and costs."[8]

In the wake of *Kotick Knew,* Sony and Microsoft publicly distanced themselves from the Company. On November 18, 2021, *The Wall Street Journal* reported that both companies were reevaluating their relationship with Activision. Internally, Microsoft leadership sent an employee-wide email stating they felt "disturbed and

_____

[8] *Id.* ¶ 97 (quoting Activision's 10-K annual report for 2021 at 22); *see also id.* ¶ 98.

deeply troubled by the horrific events and actions" at Activision.[9]  Sony struck a similar tone.  In a note to employees, their leadership stated they felt "disenchanted and frankly stunned to read" of Activision's "deep-seated culture of discrimination and harassment."[10]

On November 19, 2021, Kotick admitted during a meeting with Company executives that he might need to resign if the Sexual Misconduct Issues could not be quickly addressed.  If Kotick was terminated for cause, he would forfeit 2,201,878 unvested options and be subject to a clawback of his 2020 and 2021 equity grants worth approximately $150 million.

### D.    Kotick Engages Microsoft In Merger Discussions.

Kotick engaged in a "regular dialogue" with Microsoft's then-VP of Gaming, Phil Spencer.[11]  Kotick also had a relationship with Microsoft's CEO and Chairman, Satya Nadella, with whom he spoke "[f]rom time to time."[12]

Except through Activision, Microsoft had minimal presence in the gaming market, recognized as "the biggest and fastest-growing entertainment industry in the world."[13]  Acquiring Activision would give Microsoft access to a stream of high-quality games and make Microsoft a dominant player in the gaming industry.

---

[9] *Id.* ¶ 85.

[10] *Id.* ¶ 86.

[11] *Id.* ¶ 94.

[12] *Id.* (alteration in original).

[13] *Id.* ¶ 100 (quoting Complaint, *In the Matter of Microsoft Corp.*, No. 9412 (F.T.C. Dec. 8, 2022)).

Kotick spoke to Spencer on November 19, 2021—the day Kotick admitted to other executives that his job was at risk. During that conversation, Spencer raised the idea of Microsoft acquiring Activision. Public disclosures regarding this conversation reported that it was "on a different topic" than a possible acquisition, and that the acquisition offer came "out of the blue."[14] But the disclosures do not say what the other topic was.[15] It is reasonably conceivable that the unidentified topic involved the Sexual Misconduct Issues.

Kotick promptly reported his conversation with Microsoft to two Activision directors, Brian Kelly and Robert Morgado. Kotick and Kelly spoke to financial advisor Allen & Co. that day.

Kotick and Kelly go way back. They invested in Activision together in 1990. They ran Activision together for most of the years following their investment. Kelly held numerous positions at the Company, including as CFO from 1991 to 1997, COO from 1995 to 1998, President from 1997 to 1998, Co-Chairman of the Board from 1998 to 2012, and Chairman from 2012 until the merger closed. They co-founded The Call of Duty Endowment, a non-profit that provides grants to charities preparing veterans to compete for high-quality jobs. Kotick and Kelly were the chief negotiators of Activision's 2007 merger with Vivendi Games, Inc. They also co-invested in ASAC II LP, an entity they formed in 2012 to hold 172,968,042 Activision shares purchased

---

[14] *Id.* ¶ 96.

[15] The Proxy Statement (defined below) and the December 3, 2021 board minutes (which the Third Amended Complaint references) describe the "conversation" but do not say whether it was in person, by videoconference, or by telephone, and do not say who initiated it or how it came about.

from Vivendi, Activision's then-largest shareholder, when it liquidated most of its position.

Kotick and Morgado also have a long history. Since joining the Board in February 1997, Morgado held several senior positions. He chaired the compensation committee for over two decades and chaired the nominating and corporate governance committee for nearly as long. Additionally, he served as the lead independent director from 2018 until the merger. As chair of the compensation committee for over twenty years, Morgado approved the compensation packages that made Kotick one of the highest paid CEOs in the gaming industry.

Allen & Co. is a private investment bank. The firm began advising Activision on potential transactions in 2002. But in 2012, Allen & Co. represented Kotick and Kelly's entity, ASAC II LP, in their purchase of Vivendi's Activision shares. That role placed them on the opposite side of Activision's then-special committee of directors, on which Morgado served.

In a November 20, 2021 conversation with Kotick, Nadella confirmed Microsoft's interest in acquiring Activision. After the call, Kotick spoke with Activision's outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Two days later, Kotick and Kelly spoke with Spencer. Kotick and Kelly then informed director Robert Corti of the discussions with Microsoft.

Corti had been an Activision director since December 2003. He chaired the audit committee from December 2003 until the merger. He also served on the nominating and corporate governance committee in 2021.

15

On November 22, the same day Kotick and Kelly spoke with Spencer, the Board formed the Workplace Responsibility Committee to oversee Activision's progress toward improving its culture and eliminating harassment and discrimination. The Workplace Responsibility Committee comprised directors Dawn Ostroff and Reveta Bowers. Ostroff had been a director since June 2020 and Bowers since January 2018.[16]

It is safe to infer that the full Board communicated on or around November 22 when they formed the Workplace Responsibility Committee. But nothing suggests that the small group of people then-informed of the Microsoft overture—Kotick, Kelly, Morgado, and Corti (the "Small Group")—shared with the full Board the discussions with Microsoft.

On November 26, 2021, Kotick and Kelly spoke again to Spencer, who told them that Microsoft was considering a bid at $80 per share. The Board did not convene to discuss the overture, and no one outside the self-appointed Small Group knew. The Small Group decided themselves that Activision should be sold at a range of $90 to $105 per share. They did not base this range on the Strategic Plan. They instead considered Activision's historical trading price, research analyst estimates, and peer trading multiples. Their range was substantially lower than the two growth

---

[16] Plaintiff alleges that Bowers's relationship with Kotick dates back to 2000, when Kotick's children started attending West Hollywood's Center for Early Education, an independent primary school where Bowers had worked since 1972. *Id.* ¶ 34. Kotick served on the school board and donated $100,000 to the school's annual fund in 2021.

scenarios reflected in the Strategic Plan, which valued the Company as a standalone entity at $113 to $128 per share.

On November 28, 2021, without Board authorization, Kotick told Spencer that the Board would consider a Microsoft proposal in a range of $90 to $105 per share.

On November 29, Spencer said that Microsoft would negotiate in that range but preferred the lower end and wanted quick action. Kotick and Kelly informed Morgado and Corti. At this point, Kotick also looped in directors Hendrik Hartong and Peter Nolan. Hartong was a director from July 2015 until mid-2022. Nolan was a director from 2003 to 2008 and from October 2013 until the merger.

On December 1, 2021, Kotick and Spencer discussed introducing their respective legal teams and potential financial advisors. Based on this, it is reasonably conceivable that Kotick had selected Allen & Co. and Skadden as advisors by December 1.

### E. Kotick Informs The Board About The Microsoft Discussions.

The full Board did not learn about the Microsoft discussions until December 3, 2021. During a Board meeting held that day, Kotick and Kelly gave an "update" of the ongoing discussions with Microsoft and the $90 to $105 per share range. The Board discussed potential transaction processes. According to the Third Amended Complaint, the meeting minutes do not state whether the Board authorized a sale process or gave Kotick guidance on how to proceed. They also do not provide a basis for the price range or state whether the Board authorized the range.

Allen & Co. and Skadden attended the December 3 Board meeting. They showed up as the deal advisors. Nothing suggests that the Board members—who had just learned of Microsoft's overture—authorized Kotick to engage them.

WilmerHale attorneys also attended the meeting. At the time, WilmerHale was investigating the Sexual Misconduct Issues and defending Kotick, other current and former Activision directors and officers, and the Company in litigation over those issues. Sard Verbinnen & Co., a crisis management public relations firm, also attended. The Board discussed the Sexual Misconduct Issues and the Workplace Responsibility Committee.

The day of the Board meeting, *Morningstar* issued a report recounting the Sexual Misconduct Issues and related departures from Activision. According to the report, those issues and departures contributed to the delayed launches of *Overwatch 2* and *Diablo IV*.

### F.    Kotick Moves Forward With Microsoft.

Also on December 3—the day of the Board meeting and *Morningstar* report—Kotick and Kelly received an email from the CEO of another gaming company, "Company A." The email addressed the Board and expressed interest in exploring a potential strategic transaction. Kotick received an additional communication from the Company A CEO asking for a meeting the next week. Kotick and Kelly did not disclose the overture to the Board until December 10.

Meanwhile, Kotick advanced discussions with Microsoft. On December 6, 2021, Activision executed a non-disclosure agreement with Microsoft. The Board had

not authorized that step.[17] Shortly after entering into the non-disclosure agreement, Activision gave Microsoft the Strategic Plan.

On December 7, 2021, representatives from Activision, Allen & Co., and Skadden met with Microsoft and discussed the Strategic Plan. The next day, Spencer told Kotick that the Microsoft board had authorized a proposal to acquire Activision.

Kotick and Kelly convened a Board meeting on December 10 to discuss the Microsoft offer. During that meeting Kotick informed the Board about Company A's outreach for the first time and said that he had not responded substantively to Company A's CEO. The Board then discussed reasons why it made sense not to pursue an opportunity with Company A, including that a transaction would likely involve a significant stock component. The Board decided that a transaction with Company A was unlikely but told Kotick to meet with Company A's CEO anyway.

During the afternoon of December 10, Microsoft sent a non-binding indication of interest to acquire Activision for $90 per share. It referred to the "strategic relationship" between Microsoft and Activision, and thanked Kotick for his "collaborative approach" in recent discussions.[18]

The indication of interest acknowledged that the Sexual Misconduct Issues made Activision vulnerable. It stated that it was "a challenging time for the Company and its employees and that Activision is confronting a number of well-publicized

---

[17] *See generally* Third Am. Compl. ¶ 136.

[18] *Id.* ¶ 141.

concerns[,]" which could only have been a reference to the Sexual Misconduct Issues.[19] The letter also stated that Microsoft was "uniquely positioned to efficiently work through such issues" and could sign a definitive agreement "expeditiously" if given "exclusive" access to Activision's management and advisors.[20] Microsoft requested a response by December 13, 2021.

The Board met on December 12 to discuss Microsoft's offer. Kotick had asked Spencer about the $90 per share price given the higher range in the Strategic Plan, and Spencer responded that Microsoft might increase the price but only slightly. Allen & Co. and Skadden explained that Microsoft wanted to move quickly.

Even though Kotick personally faced career risk from the Sexual Harassment Issues, the Board permitted him to: continue negotiating with Microsoft; contact three large-cap tech companies to gauge their interest in quickly acquiring the Company; and meet with Company A's CEO.

Kotick met with Company A's CEO on December 14, 2021. He told Kotick that a strategic combination would benefit both companies but did not communicate any requests or propose specific actions. Activision never spoke to Company A again about a transaction.

### G.     Activision Lowers Its Projections.

The Board met later on December 14, 2021, with WilmerHale, Allen & Co., and Skadden in attendance. Senior management presented revised financial projections

---

[19] *Id.*

[20] *Id.* ¶¶ 141–142.

"for purposes of considering" Microsoft's offer.[21]  The projections had been adjusted downward relative to the Strategic Plan.  Management stated that the downward adjustment accounted for the "passage of time," but the Strategic Plan had been approved on November 2, just over a month before.[22]  The minutes of the Board meeting and later disclosures explained that the lowered projections were "not intended to constitute a revised [Strategic Plan], did not reflect any adjustments that Activision might make in its strategy in response to Activision Blizzard's performance in the fourth quarter of 2021, and management would not typically refresh the outlook for years beyond 2022 at this stage of Activision Blizzard's typical financial planning process."[23]

Also during the December 14 meeting, Kotick reported that two of the three other potential acquirors raised concerns about regulatory risks.

The Board also considered Allen & Co.'s conflicts disclosure, which stated that the firm had not worked for Activision or Microsoft in the prior two years.  The disclosure did not identify Allen & Co.'s prior work for Kotick and Kelly's ASAC investment vehicle, or Kotick personally.  The disclosure did state that two senior members of Allen & Co.'s team each had over $1 million invested in Microsoft.  The Board concluded that Allen & Co. did not have material conflicts.

---

[21] *Id.* ¶¶ 150–151.

[22] *Id.* ¶ 150.

[23] *Id.* ¶ 151 (cleaned up).

## H. Discussions With Microsoft Continue.

The Board met the next day, on December 15, 2021. Allen & Co. presented its financial analysis of Microsoft's $90 per share offer. This analysis was "based on the updated risk-adjusted financial forecasts approved by the [Board] on December 14, 2021, as extended through fiscal year 2026."[24]

A slide in Allen & Co.'s presentation titled "Trading Profile" showed three dates on which the stock price dropped significantly: (i) July 20, 2021, the day the DFEH sued Activision; (ii) November 2, 2021, the day Activision announced Oneal was leaving the Company and that it was delaying the release of two eagerly awaited games; and (iii) November 16, 2021, the day *The Wall Street Journal* published *Kotick Knew*. Each event related—directly or indirectly—to the Sexual Misconduct Issues.

Allen & Co.'s presentation showed that Activision's $59.52 closing price on December 14, 2021 was 43% below its fifty-two-week high and that Microsoft's $90 offer price was 14% below Activision's fifty-two-week high.

The Board directed Kotick to counter at $100 per share but authorized him to agree to $95 per share.

## I. Microsoft Presses For Exclusivity.

On December 16, 2021, Nadella communicated that Microsoft would increase its offer to $93 per share. Kotick responded that he was authorized to agree to $95 per share with a thirty-day exclusivity period. Nadella accepted the counteroffer.

---

[24] *Id.* ¶ 160.

The Board met the next day and authorized management, "led by Mr. Kotick," to finalize the deal with Microsoft.[25]  The same day, one of the three potential acquirors told Kotick that it was keen to explore a transaction, and they scheduled a follow-up video conference for December 20.  Kotick and Microsoft negotiated the exclusivity agreement over the weekend, executing it on December 20.  Kotick informed the other acquiror that circumstances had changed, and Activision would not be able to continue discussions.

The exclusivity agreement required that Activision terminate existing discussions with potential alternative bidders and notify Microsoft of any third-party interest.  The term sheet included in the exclusivity agreement provided for an outside termination date of twelve months from signing with two automatic three-month extensions and, if regulatory approval had not been received, a $2 to $3 billion termination fee from Microsoft.  The agreement was set to expire on January 17, 2022, at 11:59 a.m. Pacific Time.

### J.      Activision Lowers Its Projections Again.

The Board did not meet again until January 7, 2022.  At the meeting, Kotick updated the Board on the status of the deal.  A week later, on January 14, management presented another set of reduced projections to the Board.  This set incorporated poor results for the fourth quarter of 2021, purportedly due to the underperformance of a newly launched game.  Allen & Co. also updated the Board on Microsoft's due diligence.  Board materials reflect that Microsoft's diligence focused

---

[25] *Id.* ¶ 166.

on "Labor and Employment" and HR-related matters—which inferably included matters related to the Sexual Harassment Issues.[26]

Also at the January 14 meeting, Skadden presented on "the key terms of the draft merger agreement" including "director and officer indemnification" and "Microsoft's regulatory undertakings."[27] The Board received a presentation stating that the proposed price included adequate value for the Company's pending derivative claims. Skadden separately sent Microsoft's counsel an initial draft of Activision's confidential disclosure schedules to the merger agreement, though those schedules were not provided to the Board.

### K.     The Board Approves A Draft Merger Agreement.

Between January 14 and January 18, 2022, Activision and Microsoft exchanged multiple drafts of a merger agreement.

The Board met on January 17, 2022, the day the exclusivity agreement would expire, to consider an incomplete draft of the merger agreement dated January 17, 2022 (the "Draft Merger Agreement"). In phase one of this litigation, the court held that it is reasonably conceivable that the Draft Merger Agreement was not essentially complete in ways that mattered for effective Board approval under the DGCL.[28]

The January 17 Board meeting minutes reflect that Kotick told the Board that Microsoft's board had approved the merger on January 16, 2022.

---

[26] *Id.* ¶ 173.

[27] *Id.* ¶ 174.

[28] *See generally Sjunde AP-Fonden v. Activision Blizzard, Inc.*, 2024 WL 863290, at *8 (Del. Ch. Feb. 29, 2024, corrected Mar. 19, 2024) ["*Activision I*"].

The January 17 Board meeting minutes further indicate that "one of the key open issues" was the amount of dividends Activision could pay while the merger was pending.[29] This was an important financial term that affected the value of the transaction to the Activision stockholders.

Activision generates substantial amounts of cash. From December 31, 2019 to December 31, 2021, Activision's cash position increased from $5.8 billion to $10.4 billion. Historically, Activision had paid an annual dividend in the first quarter. Because the regulatory review process would be lengthy and the parties did not anticipate closing until the end of 2023 or the first half of 2024, the Board needed to address the 2023 dividend. The Board designated an ad hoc committee consisting of Morgado, Kelly, and Corti to address this issue. This is problematic under Delaware law, which prevents a board from delegating the statutory duty of approving the terms of a merger agreement to a board committee.[30]

As problematic, it is reasonably conceivable that the ad hoc committee did not actually negotiate the dividend issues. Rather, Kotick—who was not on the ad hoc committee—resolved the dividend issue with Nadella and the ad hoc committee approved the resolution that Kotick negotiated. Kotick and Nadella agreed that Activision may only pay "one regular cash dividend on the Company Common Stock in an amount per share of Company Common Stock not in excess of $0.47."[31]

---

[29] Third Am. Compl. ¶ 185.

[30] *See generally Activision I*, 2014 WL 863290, at *9.

[31] *Id.* ¶ 185.

Activision and Microsoft executed the final merger agreement (the "Merger Agreement") early on January 18. The Merger Agreement included a July 18, 2023 termination date.

Kotick benefited under the Merger Agreement. It included a key-man provision in which Microsoft and Activision agreed that Kotick would continue to serve as CEO and run the Company, and that the Board could extend Kotick's employment agreement by another twelve months. The Merger Agreement also provided that if the Board's two-member Workplace Responsibility Committee determined that Activision had made "appropriate *progress* toward" its publicly announced "transformational gender-related goals and other commitments[,]" then the Board could restore Kotick's pay.[32] This was different from Kotick's October salary-reduction announcement, in which he stated that the Board would restore Kotick's pay if it determined Activision had "achieved" the goals.[33]

The Merger Agreement also broadened liability protection for officers and directors. The Merger Agreement required Microsoft to indemnify Kotick and the Board for a fixed time (for six years after the merger) through Activision's current director and officer ("D&O") coverage (subject to a 350% cap on annual premiums) and for a potentially broader set of conduct covered pre-merger (including willful

---

[32] *Id.* ¶ 192 (emphasis added and internal quotations omitted).

[33] *Id.* ¶ 63.

misconduct and breach of the duty of loyalty or bad faith, as long as "any federal, state, local, municipal, multi-national or other law" permitted it).[34]

### L.     The Stockholders Approve The Merger.

The transaction (the "Merger") was subject to review by antitrust regulators, including the United Kingdom's Competition and Markets Authority (the "CMA"), the United States' Federal Trade Commission (the "FTC"), and the European Commission.

On February 1, 2022, reports emerged that the FTC would review the Merger for antitrust issues. On March 3, 2022, the FTC sent Activision and Microsoft a request for additional information. This request extended the waiting period for closing the Merger under the Hart-Scott Rodino Act until the thirtieth day after Activision and Microsoft substantially complied with the request.

Although the parties did not expect the deal to close before 2023 at the earliest, Activision issued a proxy statement on March 21, 2022 (the "Proxy Statement"). The Proxy Statement disclosed that Activision and Microsoft did not expect to close the Merger until June 30, 2023, the end of Microsoft's 2022 fiscal year. Activision scheduled a special meeting of stockholders to approve the Merger for April 28, 2022.

The Proxy Statement included the executed version of the Merger Agreement as Annex A. This version of the Merger Agreement did not include the Company Disclosure Letter, the disclosure schedules, or the Survivor's Certificate.

---

[34] *Id.* ¶¶ 206–210, 220.

Activision scheduled a stockholder meeting to approve the Merger for April 28, 2022. Approximately 68% of the voting power cast votes, with 98% voting in favor of the Merger. The day after the special meeting, Activision filed its annual statement scheduling its annual meeting for June 21, 2022.

**M.      Antitrust Regulators Challenge The Merger.**

On September 1, 2022, the CMA announced that it had concluded the first phase of its investigation and determined that the Merger may substantially reduce competition in U.K. markets for gaming consoles, multi-game subscription services, and cloud gaming services. Microsoft informed the CMA that it was not offering any concessions, after which the CMA announced that it was performing a second phase in the investigation.

On February 8, 2023, the CMA issued a provisional finding that the Merger was expected to result in a substantial reduction of competition in cloud gaming services and cloud gaming consoles. The CMA issued its final decision and report on April 26, 2023, reaffirming its provisional finding. Microsoft immediately announced that it would appeal, and Activision stated that it would support the appeal.

On November 8, 2022, the European Commission announced that it was opening an investigation into the Merger, citing the same concerns expressed by the CMA. On January 31, 2023, the European Commission issued a formal statement of objections to the Merger that mirrored the CMA's and FTC's concerns.

On December 8, 2022, the FTC filed a suit challenging the Merger and the court scheduled trial for August 2023. Activision and Microsoft stated that they would fight the FTC lawsuit.

28

## N.    Activision Achieves Record-Breaking Sales.

Meanwhile, Activision was killing it.  In October 2022, Activision released *Overwatch 2* and *Call of Duty: Modern Warfare II*.  Average daily player numbers for *Overwatch 2* doubled that of its predecessor within a month of its release, and *Call of Duty: Modern Warfare II* brought in more than $800 million worldwide in its first three days.  *Modern Warfare II* was the highest-grossing entertainment launch in 2022, the fastest game in history to cross $1 billion in sales, and the highest-selling game in the United States in 2022.

On February 6, 2023, Activision announced exceptional fourth quarter 2022 results, with all three of its segments outperforming historical metrics, consensus estimates, and the wider industry.  Analysts described Activision as "Firing on All Cylinders" and delivering "Massive Upside . . . With Microsoft Smiling from a Distance."[35]  On April 26, 2023, Activision announced first quarter 2023 results that again beat consensus estimates and set new records for revenue and earnings per share.

Building on the momentum, on June 6, 2023, Activision released *Diablo IV*, which became Activision's fastest-selling game.

## O.    Defendants Enter Into The Letter Agreement.

The no-solicitation provision of the Merger Agreement barred Activision from exploring alternatives to the Merger prior to the July 17, 2023 termination date.  As the termination date approached, Activision's excellent results underscored its value

---

[35] *Id.* ¶ 264.

as a standalone company. But employees were still calling for Kotick's resignation. And Kotick remained focused on closing the Microsoft deal.

On April 26, 2023, Kotick emailed Activision employees, stating that he was "going to do everything [he] personally can to advocate for [Activision] and help regulators understand the competitive dynamics in [the] industry."[36] He also stated: "What gives me confidence is that, whether on our own or united with another company, we are one of the strongest companies in our industry, poised for continued growth, and building on our incredible IP."[37] Kotick reiterated that message to *Variety* in a May 31, 2023 interview: "We have a great company. We have an enormous amount of momentum, and we have an extraordinary balance sheet . . . And we can continue to be successful alone like we have been for the last 30 years."[38]

The Board met on July 17, 2023, the day before the termination date. The Board approved a letter agreement with Microsoft extending the termination date to October 18, 2023 (the "Letter Agreement").

The Letter Agreement modified the Merger Agreement in several ways. Originally, the Merger Agreement structured a "Parent Termination Fee," an amount Microsoft would pay Activision, to increase over time from $2 billion to eventually $3 billion. The Letter Agreement eliminated Activision's right to collect the then-$3 billion Parent Termination Fee on the July 18 termination date. But they negotiated

---

[36] *Id.* ¶ 268.

[37] *Id.* ¶ 269.

[38] *Id.* ¶¶ 276–277 (omission in original).

a replacement termination fee schedule where Activision could collect $3.5 billion after August 29, 2023, and $4.5 billion after September 15, 2023. Additionally, the Letter Agreement narrowed Activision's rights to terminate the Merger Agreement and eliminated or waived conditions to closing.

Meanwhile, Activision's strong results generated cash even faster than usual. By June 30, 2023, Activision's cash balance had grown to over $13.1 billion—$2.7 billion of which accumulated after Activision signed the Merger Agreement. The Letter Agreement relaxed the dividend restriction in the Merger Agreement, allowing Activision to pay "one regular cash dividend for fiscal year 2023" in an amount not to exceed $0.99 per share.[39] Activision paid a total of $1.2 billion in dividends.[40]

The resolutions approving the dividend identified the issued and outstanding shares of common stock entitled to a dividend as including 428,676,471 Activision shares held by Amber Holding Subsidiary Co. ("Amber"). Activision had owned Amber since 2013 and historically treated Amber shares as treasury shares, a status the Merger Agreement acknowledged.

Kotick negotiated the Letter Agreement with Microsoft, and Activision did not consider any alternatives, such as letting the Merger Agreement terminate and continuing as a standalone entity. Allen & Co. told the Board that there was "no reason to think" any "potential counterparties who could theoretically be interested

---

[39] *Id.* ¶ 567.

[40] *Id.* ¶ 570.

in a potential transaction" would offer a higher value.[41]  But no one checked.  And no one discussed whether Activision was better off as a standalone company.

The same day that Activision announced the Letter Agreement, it announced second quarter 2023 results.  Blizzard and King beat analysts' estimates and set new second quarter records.

### P.    The Merger Closes.

On August 22, 2023, the CMA announced that Microsoft had proposed divesting certain cloud gaming rights for existing and future Activision games to Ubisoft Entertainment S.A.  On October 13, 2023, the CMA approved the restructured deal.  The same day, Microsoft and Activision filed the Certificate of Merger with Delaware's Secretary of State.  The Merger Certificate stated that it attached the certificate of incorporation for the surviving entity, but it attached a certificate that was different than Exhibit A to the Merger Agreement.

Kotick stayed on for two months after the Merger closed.  On January 17, 2024, Activision settled the DFEH action through a consent decree that called for paying eligible claimants $54.8 million.  On January 25, the DFEH withdrew its appeal of the EEOC action.

Altogether, Activision paid $18 million to resolve the EEOC action, $35 million to resolve the SEC investigation, and $54.8 million to resolve the DFEH action.

---

[41] *Id.* ¶ 528.

**Q. This Litigation Commences.**

Plaintiff Sjunde Ap-Fonden ("Plaintiff") owned stock in Activision. Before filing this suit, Plaintiff sought documents under Section 220 of the DGCL. Activision refused to produce documents, forcing Plaintiff to file an enforcement action. After Plaintiff filed suit, Activision agreed to produce some documents.

Plaintiff filed this action on November 3, 2022, asserting claims for breach of fiduciary duty against Defendants Kotick, Bowers, Corti, Hartong, Kelly, Barry Meyer, Morgado, Nolan, Ostroff, and Casey Wasserman (collectively, the "Director Defendants"), claims for aiding and abetting in breaches of fiduciary duty against Microsoft and Anchorage Merger Sub Inc. (together, "Microsoft," and together with the Director Defendants and Activision, "Defendants"), and claims against the Defendants for a host of violations of the DGCL. Plaintiff amended the complaint on January 25, 2023 (the "Amended Complaint"),[42] and supplemented its amended complaint on March 2, 2023.[43]

On March 24, 2023, Activision and the Director Defendants moved to stay this action until regulatory review of the Merger was complete and the Merger closed.[44] On May 1, 2023, Plaintiff moved to expedite its statutory claims.[45] The court denied both motions.[46]

---

[42] Dkt. 19.

[43] Dkt. 27.

[44] Dkt. 29.

[45] Dkts. 41–43.

[46] Dkt. 65.

The parties then agreed to a bifurcated schedule that initially addressed Count I of the Amended Complaint.[47] In Count I, Plaintiff claimed that Defendants violated Sections 251(b), 251(c), 251(c)(7), 251(d), and 141(c) of the DGCL and that the putative class's shares were unlawfully converted due to the statutory violations.[48] In June 2023, Defendants moved to dismiss and Plaintiff moved for partial summary judgment on Count I.[49] The court issued decisions on the motions to dismiss and motion for summary judgment on February 29, 2024.[50]

The outcome was mixed. The court denied Defendants' motion to dismiss the claims under Sections 251(b), 251(c), and 141(c), finding it reasonably conceivable that the Director Defendants failed to satisfy or violated the statutory requirements.[51] The court also denied the motion as to Plaintiff's conversion claims based on the statutory violations.[52] But the court dismissed Plaintiff's claims under Section 251(c)(7) and Section 251(d) and declined to enter summary judgment in Plaintiff's favor.[53]

---

[47] Dkt. 84.

[48] *Activision I*, 2024 WL 863290, at *3.

[49] Dkts. 69–70, 78.

[50] *Activision I*, 2024 WL 863290, at *3; *Sjunde AP-Fonden v. Activision Blizzard, Inc.*, 2024 WL 863325 (Del. Ch. Feb. 29, 2024) ["*Activision II*"].

[51] *Id.* at *8–10.

[52] *Id.* at *10.

[53] *Id.* at *9–10; *Activision II*, 2024 WL 863325, at *1, *2.

The court observed in the dismissal decision that Delaware law offers solutions for statutory defects, including judicial validation under Section 205 of the DGCL.[54] In May 2024, Microsoft and Activision sought judicial validation (the "205 Action").[55] The court granted Defendants Section 205 relief through an Order dated July 9, 2024 (the "205 Order").[56] The parties stipulated that the 205 Order mooted Counts I.A and I.C of the Complaint.

Plaintiff amended the complaint on April 22, 2024, and then filed the Third Amended Complaint on June 12, 2024.[57] Defendants moved to dismiss the Third Amended Complaint.[58] Defendants also moved to stay this action pending resolution of the 205 Action.[59] And Plaintiff moved to compel discovery.[60] The court granted the motion to compel in part and otherwise stayed discovery pending resolution of the motion to dismiss.[61]

In support of the motions to dismiss, Defendants submitted three sets of briefs, one set each from: Activision, the Director Defendants, and Microsoft.[62] Plaintiff filed

---

[54] *Activision I,* 2024 WL 863290, at *10 & n.72.

[55] C.A. No. 2024-0466-KSJM, Dkts. 1–2.

[56] *Id.,* Dkt. 27.

[57] C.A. No. 2022-1001-KSJM, Dkts. 136, 171.

[58] Dkts. 186, 188, 190.

[59] Dkt. 153.

[60] Dkts. 141, 147, 149.

[61] Dkt. 196.

[62] Dkts. 185 ("Microsoft Opening Br."), 188 ("Dir. Defs.' Opening Br."), 189 ("Activision Opening Br.").

a consolidated answering brief on November 5, 2024.[63] Plaintiff also moved to convert the motions to dismiss to motions for summary judgment and filed a Rule 56(f) Affidavit.[64] Defendants moved to strike the Rule 56(f) Affidavit.[65] The parties completed briefing on December 23, 2024, and the court heard oral argument on January 9, 2025.[66]

The court stated during the January 9 argument that it would likely take a substantial amount of time to work through the parties' extensive submissions.[67] And it did.

## II.     LEGAL ANALYSIS

Plaintiff's remaining claims fall into four categories: claims for breach of fiduciary duties and aiding and abetting in connection with the Merger (the "Merger Claims");[68] claims for breach of fiduciary duties and aiding and abetting in connection with the Letter Agreement (the "Letter-Agreement Claims");[69] claims for breach of

---

[63] Dkt. 209 ("Pl.'s Ans. Br.").

[64] Dkts. 211–213.  Plaintiff supplemented the Rule 56(f) Affidavit with leave of the court on November 18, 2024.  Dkt. 219.

[65] Dkt. 221.

[66] Dkts. 235, 237, 248.

[67] Dkt. 251.

[68] The Merger Claims appear in Counts III.C and III.D against the Director Defendants and Count V against Microsoft.

[69] The Letter Agreement Claims appear in Count IV against the Director Defendants and Count VI against Microsoft.

the DGCL (the "DGCL-Statutory Claims");[70] and claims for breach of fiduciary duties based on DGCL non-compliance (the "DGCL-Fiduciary Claims").[71]

Defendants have moved to dismiss the Third Amended Complaint under Court of Chancery Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[72] When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[73] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[74]

The pleading standard warrants emphasis because Defendants submitted numerous exhibits and affidavits that Plaintiff argues are neither incorporated by

---

[70] The DGCL-Statutory Claims, asserted against Microsoft, Activision, the Director Defendants, and Kotick as an officer, are as follows: Count I.B, which relies on Section 141(c) of the DGCL (the "Committee-Dividend Claim"); Count I.D, which relies on Section 262 of the DGCL (the "Appraisal Claim"); Count II, which asserts claims for conversion (the "Conversion Claims"); and Counts VII and VIII, which rely on Sections 170, 173, and 174 of the DGCL (the "Treasury-Dividend Claims").

[71] The DGCL-Fiduciary Claims appear in Counts III.B and IV.B against Kotick and the Director Defendants.

[72] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[73] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[74] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

reference in the Third Amended Complaint nor subject to judicial notice. According to Plaintiff, Defendants' reliance on documents outside the pleadings warrants converting the Rule 12(b)(6) motions into motions for summary judgment. Plaintiff responded with a 67-page Rule 56(f) affidavit, an eight-page supplemental affidavit, and nearly 100 exhibits, which Defendants moved to strike.

Plaintiff's motion to convert is denied except as to the Treasury-Dividend Claim, and this decision ignores the documents extraneous to the pleadings. Defendants' motion to strike is granted subject to the same exception.

## A.    The Merger Claims

Plaintiff claims that the Director Defendants breached their fiduciary duties in connection with the Merger and that Microsoft aided and abetted those breaches.

### 1.    Breach Of Fiduciary Duties

Generally, the court begins a pleading-stage analysis of a claim for breach of fiduciary duty by identifying the standard of review. That is because Delaware courts evaluate whether directors have complied with their fiduciary duties through the lens of a standard of review.[75]   There are three potential standards. The most onerous standard is the entire fairness standard. The most deferential standard is the business judgment standard. Enhanced scrutiny falls in between.[76]

---

[75] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.,* 2017 WL 1437308, at *25 (Del. Ch. Apr. 14, 2017).

[76] *See In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *32 (Del. Ch. Mar. 15, 2023) [*"Mindbody Post-Trial Decision"*], *rev'd in part on other grounds,* 332 A.3d 349 (Del. 2024).

Although this gating issue is quite common, it is also often quite complicated, as the parties' dispute over the applicable standard here demonstrates. Plaintiff argues that the entire fairness standard applies because a majority of the Director Defendants harbored conflicts when they approved the Merger Agreement.[77] The Director Defendants deny that any of them were conflicted. They argue that enhanced scrutiny supplies the presumptive standard under *Revlon*,[78] but that an uncoerced and fully informed stockholder vote restores the business judgment rule under *Corwin*.[79]

This decision skips Plaintiff's entire-fairness argument and evaluates Plaintiff's claims under the framework of enhanced scrutiny, as Defendants urge. The first step in this analysis requires assessing under *Corwin* whether the stockholder vote lowered the standard of review from enhanced scrutiny to business judgment. It did not, so the court must move to the next step of assessing whether the fiduciaries' action fell within a range of reasonableness. Here, it is reasonably conceivable that the Merger fell outside the range of reasonableness, so the court

---

[77] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (stating that the entire fairness standard applies when "there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority").

[78] *See* Dir. Defs.' Opening Br. at 23 (citing the standard under *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986)).

[79] *See* Dir. Defs.' Opening Br. at 49 (arguing that the stockholder vote restored the business judgment standard under *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015)).

must move to the third step and consider under *Cornerstone* whether any director inferably committed a non-exculpated breach of duty.[80]

### a.   *Corwin*

Under *Corwin*, "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[81] Defendants' *Corwin* argument fails on at least two grounds.

First, a defendant must comply with the "DGCL's prescribed methods for taking stockholder action to obtain the benefits of ratification."[82] Under *Corwin*, "the business judgment presumption 'cannot be achieved without complying with the statutory formalities in the DGCL for taking stockholder action.'"[83] It is reasonably conceivable that the stockholder vote did not comply with the statutory formalities of the DGCL, as the court held in *Activision I*.[84] Because it is reasonably conceivable that the stockholder vote did not comply with statutory requirements, Defendants cannot rely on *Corwin* to lower the standard or review to business judgment at the pleading stage.

---

[80] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

[81] *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 254 (Del. Ch. 2021) (quoting *Corwin*, 125 A.3d at 309); *see also In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 738 (Del. Ch. 2016) (concluding that in mergers approved under Section 251(h), stockholder approval "by accepting a tender offer has the same cleansing effect as a vote in favor of that merger").

[82] *Volcano*, 143 A.3d at 745.

[83] *Id.* (quoting *Espinoza v. Zuckerberg*, 124 A.3d 47, 66 (Del. Ch. 2015)).

[84] *Activision I*, 2024 WL 863290, at *8–9.

Second, it is reasonably conceivable that the Proxy Statement was materially misleading and incomplete. A plaintiff challenging the sufficiency of disclosures for *Corwin* purposes bears the burden of pleading a disclosure deficiency.[85] When assessing disclosure deficiencies at the pleading stage, the court must determine "whether Plaintiff's complaint, when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[86] The inquiry is fact-intensive, and the court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law.[87] One well-pled disclosure deficiency is sufficient to defeat a *Corwin* defense at the pleading stage.[88]

---

[85] *Morrison v. Berry*, 191 A.3d 268, 282 & n.60 (Del. 2018).

[86] *Id.*; *see also Malpiede v. Townson*, 780 A.2d 1075, 1086–87 (Del. 2001).

[87] *See, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (reversing order granting defendants' motion to dismiss where "answer[ing] the complaint, discovery[,] and a trial may all be necessary to develop a complete factual record before deciding whether, as a matter of law, the . . . [d]irectors breached their [disclosure] duty"); *Branson v. Exide Elecs. Corp.*, 1994 WL 164084, at *3 (Del. 1994) (TABLE) ("Whether or not a statement or omission in an offering prospectus was material is a question of fact that generally cannot be resolved on a motion to dismiss, but rather it must be determined after the development of an evidentiary record."); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *10 (Del. Ch. Jan. 18, 1996) (declining to rule that an omission was immaterial as a matter of law and noting that "[a] question of materiality is difficult to treat as a question of law on a motion to dismiss").

[88] *Kihm v. Mott*, 2021 WL 3883875, at *12 (Del. Ch. Aug. 31, 2021), *aff'd*, 276 A.3d 462 (Del. 2022).

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[89]  Put differently, "an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[90]

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading."[91]  "[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[92]  A "[p]artial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[93]

---

[89] *Morrison*, 191 A.3d at 282 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[90] *Id.* at 283 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (cleaned up).

[91] *Id.*

[92] *Id.* (quoting *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1280 (Del. 1994)); *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) ("Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression."); *In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 448 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts.").

[93] *City of Sarasota Firefighters' Pension Fund v. Inovalon Hldgs., Inc.*, 319 A.3d 271, 304 (Del. 2024) (citing *Appel*, 180 A.3d at 1064).

42

The most glaring omissions concern the Proxy Statement's treatment of the Sexual Misconduct Issues. The Proxy Statement lists twenty-four reasons for the Board's approval of the Merger and thirteen negative factors. But the list does not mention the Sexual Misconduct Issues.[94] Nor does the Proxy Statement disclose that Microsoft initiated negotiations three days after *Kotick Knew* ran, cited the "challenging time for the Company and its employees [as] Activision [confronts] a number of well publicized concerns" when making the $90 per share offer,[95] and made the Sexual Misconduct Issues a central focus of diligence.[96] The Proxy Statement also failed to disclose Allen & Co.'s analysis that the DFEH Action and *Kotick Knew* had driven down Activision's stock price. The Board's single-bidder approach "forced [stockholders] to place heavy weight" on Allen & Co.'s fairness opinion, elevating the significance of the Proxy Statement's disclosures concerning that opinion.[97] Taken together, these omissions created a misleading and incomplete narrative that the Sexual Misconduct Issues had no role in the Merger and were irrelevant to assessing the Merger's value to stockholders.

---

[94] Third Amended Compl. ¶ 450 (citing Proxy Statement at 43–48).

[95] *Id*. ¶¶ 141, 452.

[96] *Id.* ¶ 337. As to diligence, the Proxy Statement again did not mention the Sexual Misconduct Issues. It stated only that Microsoft conducted diligence into "various business, financial, tax, accounting and legal matters" during the exclusivity period. Proxy Statement at 40. It is reasonably conceivable that the Sexual Misconduct Issues were a focal point of diligence, and that this statement's failure to mention that explicitly rendered it incomplete or misleading.

[97] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *16 (Del. Ch. Oct. 2, 2009).

There are other issues with the Proxy Statement. For example, it repeatedly cites to the Parent Termination Fee, which was $2 billion at the time the stockholders voted, was negotiated heavily, and was identified as a reason why the Board adopted and recommended the Merger.[98] But Microsoft negotiated benefits that arguably offset the Parent Termination Fee. Those benefits appeared in the Company Disclosure Letter, which the stockholders did not receive.[99] In Section 6.15 of that letter, Activision covenanted to enter into a "Cloud Agreement" to purchase cloud services from Microsoft. Those services were equal to $0.7 billion, or over one-third of the then-$2 billion Parent Termination Fee.[100] In light of the Proxy Statement's disclosure concerning the Parent Termination Fee, a reasonable Activision stockholder would have considered it important to know that Activision had agreed on key terms to purchase at least $0.7 billion worth of cloud services from Microsoft.

Plaintiff identifies other alleged disclosure deficiencies, but this analysis need not reach those. Defendants cannot rely on the stockholder vote to restore the business judgment rule under *Corwin*.

### b. *Revlon*

The cash-for-stock Merger was a final-stage transaction presumptively subject to enhanced scrutiny under *Revlon*.[101] The court must therefore examine whether

---

[98] Third Am. Compl. ¶¶ 481–483.

[99] *See Activision I*, 2024 WL 863290, at *1.

[100] Third Am. Compl. ¶¶ 14, 480.

[101] 506 A.2d 173 at 183.

the fiduciaries of the corporation have performed their fiduciary duties "in the service of a specific objective: maximizing the sale price of the enterprise."[102]

"The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly."[103] The reasonableness standard "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[104] And it does not permit courts to "substitute their business judgment for that of the directors."[105] Under *Revlon*, "directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[106]

"The sins of just one fiduciary can support a viable *Revlon* claim."[107] In *Toys 'R' Us*, this court observed that "the paradigmatic context for a good *Revlon* claim . . .

---

[102] *Malpiede*, 780 A.2d at 1083 (citing *Revlon*, 506 A.2d at 183); *see also Revlon*, 506 A.2d at 182–83 (explaining that, in the change-of-control context, the duty of loyalty requires "the maximization of the company's value at a sale for the stockholders' benefit"); *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

[103] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830–31 (Del. Ch. 2011).

[104] *In re Toys 'R' Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005).

[105] *QVC*, 637 A.2d at 45.

[106] *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011) (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595–96 (Del. Ch. 2010)).

[107] *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *14 (Del. Ch. Oct. 2, 2020) ["*Mindbody Dismissal Decision*"] (citing *Kahn v. Stern*, 2018 WL 1341719, at *1 (Del. 2018) (TABLE); *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *12 (Del. Ch. Dec. 10, 2018)).

is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price."[108]

Plaintiff's *Revlon* claim tracks the paradigmatic theory. Plaintiff alleges that Kotick was bent on a certain direction, rushed Activision into an unfair transaction with Microsoft to keep his job, secured his change-of-control payments, and insulated himself from liability. Then, Kotick tilted the sale process to secure these outcomes, resulting in a transaction that fell outside of the range of reasonableness.

Plaintiff adequately alleges that Kotick manipulated the process to favor Microsoft. Microsoft offered speed, deal certainty, and—inferably—a friendly landing place for Kotick. Kotick controlled the timing and structure of the sale process. And it is reasonably conceivable that he tilted the process to favor Microsoft in multiple ways.

Foremost, it is reasonably conceivable that Kotick undercut Activision's negotiating leverage by establishing a low negotiating range and then proposing Activision's sale for as little as $90 per share, at a time when Activision had little negotiating leverage.[109] The Sexual Misconduct Issues depressed Activision's stock

---

[108] 877 A.2d at 1002; *see also Mindbody Appellate Decision*, 332 A.3d at 383; *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007) (stating that when "directors bias the process against one bidder and toward another not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty").

[109] *See, e.g., In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *16 (Del. Ch. Apr. 11, 2017) (finding plaintiff's allegations well pled when "the [b]oard rushed the sales process while the [c]ompany was in turmoil and then lost all negotiating

46

price. After trading over $90 in June and July 2023, Activision's stock price declined to $66.14 on November 16. The effects of a scandal on a Company's stock trading price are often temporary. Rather than wait for the stock to recover, however, Kotick rushed to negotiate the deal during a period of crisis. He exacerbated Activision's weak position by proposing a range below what was reflected in the Company's Strategic Plan. By November 28, 2021, Kotick proposed a $90–$105 range to Microsoft, well below the Strategic Plan's $113–$125 per share range.

It is also reasonably conceivable that Kotick brushed off other potential bidders, undercutting Activision's ability to use "competitive pressure . . . to extract a higher price."[110] This can be inferred from the contrast between Kotick's responsiveness to Microsoft and his delayed, perfunctory contacts with other potential bidders.[111] The CEO of another gaming company contacted Kotick on December 3, 2021, but Kotick waited eleven days to meet with the CEO. During that period, Activision executed the Microsoft non-disclosure agreement (thus precluding a bidding war), gave Microsoft the Strategic Plan, held a diligence meeting with Microsoft, and received Microsoft's letter of intent. After Company D said on Friday,

---

leverage" and thus "may have wrongfully induced the . . . stockholders to vote in favor of the [m]erger for reasons other than the economic merits of the transaction"); *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12–15 (Del. Ch. Nov. 20, 2018) (denying a motion to dismiss when plaintiff alleged directors breached their fiduciary duties by selling the company "at the nadir of its negotiating leverage" (internal quotation marks omitted)).

[110] *Mindbody Post-Trial Decision*, 2023 WL 2518149, at *38.

[111] *In re PLX Tech. Inc. S'holders Litig.*, C.A. No. 9880-VCL, at 33 (Del. Ch. Sept. 3, 2015) (TRANSCRIPT) ["*PLX* Tr."].

December 17, 2021 that it was eager to pursue discussions with Activision, Kotick set a video conference for Monday, December 20. Over that weekend, Activision finalized the exclusivity agreement with Microsoft. It is reasonable to infer based on these events that Kotick not only brushed off alternative bidders but also tipped off Microsoft to third-party interest.[112]

It is reasonably conceivable that Kotick controlled and limited information to the Board to secure directors' support for the Merger. Plaintiff alleges that Kotick repeatedly acted first and informed the Board later, only telling the Board what he wanted it to know. Kotick involved selected directors in phased conversations, lining up support from his longtime colleagues before any Board meeting. Kotick convened a Board meeting on December 3 after he had been negotiating with Microsoft for two weeks and had proposed the $90–$105 range. At that time, he told the Board that Kelly, Morgado, and Corti knew of the negotiations, not mentioning Hartong and Nolan.[113]

It is reasonably conceivable that Kotick depressed the projections to justify the Merger price. Kotick cut the projections after Spencer told Kotick on December 10 that Microsoft would not pay much over $90, and again after agreeing to the $95 Merger price. The "rapid turnabout regarding the projections supports a pleading-stage inference" that Company management, including Kotick, "acted in bad faith to

---

[112] *See In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at \*5 (Del. Ch. June 25, 2018) (reasonably inferring a tip).

[113] *See Mindbody Appellate Decision*, 332 A.3d at 365 (involving staged discussions with directors).

create a set of numbers designed to justify the sale price."[114] It is reasonably conceivable that Kotick cut the projections to eliminate the disconnect between the $95 Merger price and $113–$128 Strategic Plan range.[115]

In sum, it is reasonably conceivable that Kotick tainted the sale process by undercutting Activision's negotiating efforts, stiff-arming alternative bidders, delaying and limiting disclosures to the Board, and reducing management projections to justify Microsoft's price.

In response, Defendants seek countervailing inferences based on other factual contentions—some drawn from the Third Amended Complaint and others set out in their briefing. They say that Microsoft initiated sale discussions, not Activision.[116] The Board negotiated Microsoft's opening offer of $80 per share to $95 per share, agreeing to exclusivity only after.[117] The lowered projections reflected fourth quarter performance.[118] The Board directed Allen & Co. and management to pursue other unsolicited inquiries.[119] Plaintiff cannot allege that a better offer was available or

---

[114] *Goldstein v. Denner*, 2022 WL 1671006, at *39 (Del. Ch. May 26, 2022).

[115] *See Mindbody Dismissal Decision*, 2020 WL 5870084, at *21 (finding it reasonably conceivable that a conflicted CEO "strategically tanked" target's stock price); *see also Chester Cnty. Employees' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *17 (Del. Ch. June 21, 2019) (finding it "reasonably conceivable that the [directors] placed management's interests ahead of their obligation to maximize stockholder value" when they "permitted [the CEO] to revise projections downward, which made the . . . merger price look more attractive").

[116] Dir. Defs.' Opening Br. at 39.

[117] *Id.* at 40.

[118] *Id.* at 15 n.8.

[119] *Id.* at 39–40.

that the deal terms precluded one from emerging.[120] The stockholders that approved the Merger could have—but did not—force Kotick out. They argue that, given these facts, the only reasonable inference is that Kotick did not taint the process at all, and the sale process led to the Board obtaining the best value reasonably available.

Setting aside that some facts on which Defendants rely are unproven contentions, they do not lead inescapably to the conclusion that the process was reasonable. They are countervailing facts that, if proven, will be weighed against the evidence that Plaintiff presents at trial. They cannot be weighed now against the plaintiff-friendly inferences a court must draw at the pleading stage. Given Plaintiff's allegations, it is reasonably conceivable that Kotick tainted the sale process and tilted it in favor of Microsoft.

Plaintiff has stated a claim under *Revlon*. It is reasonably conceivable that the process leading to the Merger fell outside of the range of reasonableness.

### c. *Cornerstone*

Under *Cornerstone*, a plaintiff must plead a non-exculpated claim against any director protected by an exculpatory charter provision or that director will be entitled to be dismissed from the suit.[121] Well-pled facts that track the paradigmatic *Revlon* theory will typically support a non-exculpated claim as to the conflicted fiduciary. But under *Cornerstone*, a plaintiff must plead facts sufficient to state a non-exculpated claim against each director protected by an exculpatory charter provision.

---

[120] *Id.* at 40.

[121] 115 A.3d at 1179–87.

To do so, the plaintiff must "plead[ ] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interest, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[122]

### i. Kotick

As to Kotick, Plaintiff's well-pled paradigmatic *Revlon* theory easily supports a non-exculpated claim. Most of the allegations supporting this inference are set out in the *Revlon* analysis. In addition, Plaintiff has adequately alleged that Kotick's job was at risk and that he was bent on a transaction that would extend his employment, protect his change-of-control benefits, and insulate him from liability.

It is reasonably conceivable that Kotick's job was at risk. Plaintiff alleges that Kotick knew for years about the Sexual Misconduct Issues at Activision. After *The Wall Street Journal* coverage detailed these allegations, employees began calling for Kotick's resignation through protests and petitions. And Activision's most important business partners sought to distance themselves from the Company. In an internal email later quoted by the media, Microsoft said it was reevaluating its relationship with Activision on November 18, 2021. Under pressure, Kotick admitted during a November 19, 2021 meeting with Company executives that he might need to resign if the Sexual Misconduct Issues could not be quickly addressed. And Kotick engaged in discussion with Microsoft regarding a Merger on the same day that he allegedly acknowledged that his job was at risk.

---

[122] *Id.* at 1179–80.

It is reasonably conceivable that the transaction made Kotick's employment more secure in three ways. Section 5.1(iii)(B) of the Merger Agreement required Activision to "keep available the services of its current officers and key employees."[123] Section 5.2(g) precluded Activision from terminating any employee at the level of Senior Vice President or above without Microsoft's approval. And Section 2.6(b) ensured Activision's officers would remain after the Merger.[124]

It is reasonably conceivable that Kotick sought to lock-in his change-of-control benefits. If Kotick was terminated for cause, he would forfeit 2,201,878 unvested options and be subject to a clawback of his approximately $150 million of 2020 and 2021 equity grants. The Merger Agreement helped avoid this outcome and protected Kotick's performance stock units granted in 2020, which had a grant-day value of $150 million. Ultimately, Kotick received $400 million due to the Merger. Reasonable minds can debate whether change-of-control benefits, standing alone, give rise to a conflict in a sale process. But compared to Kotick potentially losing his job, his reduced compensation of $62,500, and forfeiting his options and performance stock units, it is reasonably conceivable that Kotick's change-of-control benefits supplied a significant financial incentive to favor a transaction.[125]

---

[123] Third Am. Compl. ¶ 189.

[124] The transaction also lowered the bar Kotick needed to clear to restore his salary, requiring that Activision only make "appropriate progress toward" its publicly announced "transformational gender-related goals and other commitments" rather than "achieve[]" them. *See id.* ¶¶ 63, 191.

[125] In *Wayne County Employees' Retirement System v. Corti*, this court found that Kotick's change-of-control benefits did not render Kotick conflicted when negotiating the Vivendi merger that would trigger those benefits. 2009 WL 2219260 (Del. Ch. July 24, 2009). But circumstances changed for Kotick. The complaint challenging

52

It is reasonably conceivable that the transaction insulated Kotick from liability in connection with the Sexual Harassment Issues. The Merger Agreement required Microsoft to indemnify Kotick and the Board to the fullest extent permitted by applicable law for six years following the Merger for conduct occurring "prior to, at or after the" Merger.[126] Third-party indemnification rights are not subject to the same limitations imposed by the DGCL. The Merger Agreement obligated Microsoft to indemnify Kotick and the Board for willful misconduct and breach of the duty of loyalty or bad faith, provided "any federal, state, local, municipal, multi-national or other law" permitted it.[127] And further it required Activision and Microsoft to maintain for six years Activision's current D&O coverage, subject to a 350% cap on annual premiums. Activision's 2021 D&O premium was $4.1 million, so Activision's directors and officers are entitled to D&O coverage up to an annual premium cost of $14.35 million. These were all improvements over the pre-Merger status quo.

In response to these allegations regarding Kotick's conflicts, Defendants again seek countervailing inferences based on other factual contentions. They insist that the transaction did not secure Kotick's employment, noting that Section 5.2(g) of the Merger Agreement did not exempt Kotick from termination. They note that Kotick could be terminated for cause by Activision at any time and without cause in consultation with Microsoft. They state that the Activision stockholders twice voted

the Vivendi merger failed to allege that Kotick's "job[] [was] ever in danger." *Id.* at *11. That is not the case here.

[126] Third Am. Compl. ¶ 206.

[127] *Id.* ¶¶ 206–209.

53

to re-elect Kotick. But none of these facts render it less reasonable to infer the Kotick feared for his job when he began negotiating a deal with Microsoft—he said as much on November 19, according to Plaintiff.

Defendants also argue that "Delaware courts have long rejected allegations that an acquiror's agreement to provide post-closing indemnification creates a disabling conflict."[128] In support of this "long rejected" theory, Defendants cite a single authority, *In re Talley Industries Inc. Stockholders Litigation*.[129] But the allegations in *Talley* were particularly spartan. There, the plaintiff alleged that post-closing indemnification rendered the board conflicted, but the board was indemnified pre-merger and faced no real exposure to liability.[130] The court rightly deemed these allegations insufficient to create a disabling conflict.[131] But the court did not go so far as to hold that post-closing indemnification can never serve as a source of conflict.[132] At 320 pages, the Third Amended Complaint is far from the skeletal pleading easily dismissed in *Talley*.

Altogether, the allegations in the Third Amended Complaint make it reasonably conceivable that Kotick pursued a potential acquisition with Microsoft to

---

[128] Dir. Defs.' Opening Br. at 29.

[129] *In re Talley Indus., Inc. S'holders Litig.*, 1998 WL 191939, at *8, *10 n.4 (Del. Ch. Apr. 13, 1998).

[130] *Id.* at *4.

[131] *Id.* at *12 (rejecting "as lacking in any foundation in the record the . . . arguments that: (i) the [] directors solicited and approved the . . . agreement to further their own interest in continued indemnification").

[132] *See id.*

avoid termination, secure his change-of-control benefits, and insulate himself from liability. Put differently, Plaintiff has adequately alleged that Kotick was conflicted and acted in bad faith with respect to the Merger. Plaintiff has stated a non-exculpated claim as to Kotick.[133]

### ii.    The Director Defendants

As to the Director Defendants, Plaintiff's theory is that they knew Kotick was conflicted, did nothing to manage Kotick's conflicts, and prioritized Kotick's interests over a process that would secure the highest deal price. In other words, Plaintiff contends that it is reasonably conceivable that the Director Defendants favored Kotick's interests over the Company and the stockholders' interests, thereby acting in bad faith. This too is reasonably conceivable.

In the *Revlon* context, a board is required to "maintain an active and direct role" in the merger process "from beginning to end," including identifying and managing conflicts of interest and being reasonably informed of strategic alternatives.[134] In *KCG*, for example, the plaintiff alleged that the director defendants knowingly placed a conflicted officer in a position to extract compensation for management at the expense of the merger consideration received by the

---

[133] Plaintiff argues that Kotick is not exculpated because he acted as CEO in breach of his duty of loyalty and with reckless indifference to stockholders' interests. Because Plaintiff has adequately alleged that Kotick acted disloyally, the court need not distinguish between situations in which Kotick was acting as an officer and those in which he was acting as a director.

[134] *KCG*, 2019 WL 2564093, at *16 (cleaned up) (citations and internal quotation marks omitted).

stockholders.[135]  They also approved last-minute revisions to the company's projections that made the deal price seem more reasonable.[136]  The court held that these allegations supported claims for breach of fiduciary duty against the defendant directors.[137]

The allegations here are at least as sufficient to implicate the other Small Group members—Kelly, Morgado, and Corti.  Each knew of *Kotick Knew*.  Each knew of the protests.  Each knew that the Company's stock was depressed as a result.  Each knew that the Board-approved Strategic Plan contemplated a value of $113 to $128 per share.  At least all of this is reasonably conceivable.  And each could easily deduce that the timing of the deal with Microsoft was bad for the Company given the effect of the Sexual Misconduct Issues on the stock trading price, but potentially good for Kotick, whose job was at risk.  Yet when Kotick went to each of the Small Group members to socialize the possibility of a deal with Microsoft, they jumped right in, inferably withheld knowledge of Microsoft's outreach to Activision from the full Board during the Board's communications on November 22, and decided on a $90–$105 range that allegedly undervalued the Company.  It is reasonably conceivable that each of the Small Group Members placed Kotick's interests ahead of value maximization, and thus Plaintiff has stated a non-exculpated claim against each of them.

---

[135] *Id.* at *17.

[136] *Id.*

[137] *Id.*

56

The claims are less stark as to the other Director Defendants, but Plaintiff nevertheless states a claim against each. When the full Board finally convened on December 3, 2021, it did not take control of the process. No one confronted Kotick's conflicts, which were the "elephant in the []room."[138] No one questioned the $90–$105 negotiating range, the timing of the process, or even Kotick's choice of Allen & Co. as financial advisor. The Board never considered an independent advisor or measures to neutralize Allen & Co.'s conflicts. Rather than handle the Merger negotiations with "two-fisted bargaining,"[139] the Board let Kotick control discussions with Microsoft and other bidders. And the Board let Kotick repeatedly decrease projections to justify the Merger price and instructed Allen & Co. to rely on those pessimistic projections.

It is worth pausing again on the $90–$105 negotiating range. The Strategic Plan supports a pleading-stage inference that the $90–$105 undervalued Activision.[140] The Board had only recently approved the Strategic Plan, on November 2, 2021. Two scenarios in the Strategic Plan valued Activision at $113 per share and $128 per share.

Ultimately, only twelve days after first learning of Microsoft's overture, the Board authorized Activision's sale at $95. They then rushed to approve the Draft

---

[138] *Cf. Saba*, 2017 WL 1201108, at *20.

[139] *PLX* Tr., C.A. No. 9880-VCL, at 35 (quoting William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 Texas L. Rev. 1, 46 (2014)).

[140] *Denner*, 2022 WL 1671006, at *37 (inferring the board "dramatically undervalued" the Company when its counteroffer was significantly below internal valuations).

Merger Agreement before Microsoft's exclusivity agreement expired, violating multiple basic statutory provisions along the way.[141] Given the Board's awareness of Kotick's conflicts, these allegations make it reasonable to infer that their hasty sale of Activision was in bad faith.[142]

In response, the Director Defendants argue that the Merger was value-maximizing, and so Plaintiff has not stated a claim against anyone under *Revlon*. They argue that the $95 price was "unmatched" and "no other bidders emerged" during exclusivity and post-signing.[143] They also argue the Merger price was a premium over Activision's stock price.[144]

The Director Defendants' factual arguments, however, again ignore the well-pled allegations suggesting that Kotick tilted the sale process to ensure that no other bidders emerged by favoring Microsoft from the outset. They ignore that the market price had dropped precipitously in the wake of the Sexual Misconduct Issues, as Activision's own financial advisor, Allen & Co., documented. They ignore that the Strategic Plan concluded that the market was undervaluing Activision and acknowledged that the scandal-related depletion of talent delayed releases in the short-term.

---

[141] *See Activision I*, 2024 WL 863290, at *1–10.

[142] *KCG*, 2019 WL 2564093, at *17 (concluding plaintiff's complaint "supports an inference of bad faith, and states a non-exculpated claim" against the board under *Revlon*); *Saba*, 2017 WL 1201108, at *20 (same); *Answers*, 2012 WL 1253072, at *7 (same).

[143] Director Defs.' Opening Br. at 40.

[144] *Id.* at 40.

As a general matter, there is "nothing inherently wrong with a [b]oard delegating to a conflicted CEO the task of negotiating a transaction."[145] But if a board delegates negotiations to a conflicted CEO it "must properly oversee and manage the conflict."[146] It is reasonably conceivable that the Board failed to manage known conflicts here. Plaintiff adequately alleges a non-exculpated claim under *Cornerstone* for breach of fiduciary duty against each of the Director Defendants. The Director Defendants' motion to dismiss the Merger Claims for breach of fiduciary duty is denied.

### 2. Aiding And Abetting

To state a claim for aiding and abetting, a plaintiff must allege that a third party knowingly participated in a breach of fiduciary duty. Plaintiff has adequately alleged a predicate breach. Microsoft argues that Plaintiff fails to allege knowing participation.

The Delaware Supreme Court recently revisited the knowing participation element of an aiding and abetting claim in *Mindbody*[147] and *Columbia*.[148]

In *Mindbody*, the trial court held an acquiror liable for aiding and abetting disclosure breaches. A conflicted CEO tilted the sale process to the acquiror, and the proxy statement did not disclose facts revealing the severe defects in the process. The

---

[145] *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 721 n.69 (Del. 2020).

[146] *Id.* (cited in Director Defs.' Opening Br. at 42).

[147] *Mindbody Appellate Decision*, 332 A.3d 349.

[148] *Columbia Appellate Decision*, 2025 WL 1693491.

acquiror was involved in and thus aware of the process defects. And the acquiror reviewed the proxy statement and was thus aware that it did not disclose the process defects. On these facts, the trial court found that the acquiror knowingly participated in the disclosure breaches.

The Delaware Supreme Court reversed the trial court's finding of aiding and abetting liability, holding that knowing participation "involves two distinct concepts that are sometimes analyzed separately: knowledge and participation."[149]

As to knowledge, the Court explained that a plaintiff must prove two types of knowledge with respect to the defendant: "knowledge that the primary party's conduct was a breach" and "actual knowledge 'that their conduct was legally improper.'"[150] The Court emphasized that a plaintiff must prove both types— knowledge of a primary party's misconduct is not enough.

As to participation, the Court explained that Delaware law "requires that the aider and abettor provide 'substantial assistance' to the primary violator."[151] The Justices held that a plaintiff must demonstrate "overt participation such as active 'attempts to create or exploit conflicts of interest in the board' or an overt conspiracy

---

[149] *Mindbody Appellate Decision*, 332 A.3d at 390.

[150] *Id.* at 392 (quoting *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)).

[151] *Id.* at 392 (quoting *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015)).

or agreement between the buyer and the board[.]"[152] A "failure to act" and "passive awareness" are insufficient.[153]

To analyze both knowledge and participation, the Court relied on the test for substantial assistance found in Section 876 of the Restatement (Second) of Torts, which involves four factors:

> The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;
>
> The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;
>
> The nature of the relationship between the secondary and primary actors; and
>
> The secondary actor's state of mind.[154]

The Court sequenced its analysis to track these four points. On the first factor, the Court concluded that material disclosure violations satisfied the severity analysis, and that the trial court correctly held that at least three omissions were material.[155]

On the second factor, the Court concluded that the plaintiff failed to show the relevant magnitude of assistance. The high court held that the acquiror merely reviewed the proxy statement pursuant to a contractual right and had declined to

---

[152] *Id.* at 393 (quoting *Malpiede*, 780 A.2d at 1097).

[153] *Id.* at 399.

[154] *Id.* at 395–96 (quoting *Dole*, 2015 WL 5052214, at *42) (bullet points omitted).

[155] *Id.* at 396–98.

propose any changes.[156] The Court further observed that the primary violator, the CEO, had all the same information as the acquiror.[157] The Court concluded that the acquiror "passively stood by while [the CEO] breached his disclosure duty," and held that a passive stance does not qualify as substantial assistance.[158]

On the third factor, the Court described the relationship between the acquiror and CEO as at "arms'-length."[159] The Court stated that the acquiror's "status as a third-party bidder affords it some protection in its negotiations with potential target companies and the directors and officers of those companies" and that this protection weighs against a finding of substantial assistance.[160] The Court added that the participation element should be interpreted to protect an acquiror from "costs of discovery,"[161] suggesting that it should be applied at the pleading stage to limit litigation.

The Court declined to treat the acquiror's contractual right to review the merger agreement as an obligation to correct any materially misleading omissions known to the acquiror, citing "compelling public policy reasons not to read contractual disclosure-based obligations" in this fashion.[162] The Court suggested that doing so would be the equivalent of "implying independent fiduciary duties between the third-

---

[156] *Id.* at 401.

[157] *Id.*

[158] *Id.* at 401–02.

[159] *Id.* at 402.

[160] *Id.*

[161] *Id.* at 392.

[162] *Id.* at 404.

party buyer and the target's stockholders," thereby equating material participation with fiduciary responsibilities.[163] The Court explained that such a move "would collapse the arms'-length distance between the third-party buyer and the target[.]"[164]

On the last factor, which the Court interpreted as coextensive with the two-fold knowledge requirement, the Court held: "The trial court made no finding that indicated that [the acquiror] knew that its failure to abide by its contractual duty to notify Mindbody of potential material omissions in the Proxy Materials was wrongful[.]"[165] Accordingly, the Court concluded that the record did not support a finding of knowledge.

Assessing the factors individually and holistically, the Court concluded that the trial court erred in finding that the acquiror knowingly participated in the underlying breach. The Court therefore reversed the judgment against the acquiror.[166]

In *Columbia*, the trial court held an acquiror liable for aiding and abetting in both sale-process and disclosure breaches. The court based its finding of knowing participation in the sale-process breaches in part on the acquiror's willingness to engage with conflicted fiduciaries in breach of a standstill agreement. For the knowing-participation standard, the trial court quoted language in *RBC* and its progeny stating that the plaintiff must demonstrate that "the aider and abettor had

---

[163] *Id.*

[164] *Id.*

[165] *Id.* at 406.

[166] *Id.*

actual or constructive knowledge that their conduct was legally improper."[167] The court then held that the plaintiff had demonstrated constructive knowledge at a minimum.[168] The court did not reach the issue of actual knowledge because it was unnecessary under the governing test. The court based its finding of knowing participation in the disclosure breaches on the fact that the acquiror exchanged drafts of the proxy statement. The court also based this finding on a contemporaneous email in which the acquiror's management team declined to offer corrections to the disclosures.

The Delaware Supreme Court reversed both bases for aiding and abetting liability. Relying on its *Mindbody* decision, which came out while *Columbia* was on appeal, the Court overruled the "constructive" knowledge standard of *RBC* and its progeny, holding that a plaintiff must now prove *actual* knowledge to prevail on an aiding and abetting claim.[169] Accordingly, knowledge of a counterparty's conflicts of interest and eagerness to sell, evidenced by encouraging a bid, assuring no competition, and ignoring contractual standstill requirements, is not enough.[170] On the disclosure issue, the Court held that although the acquiror participated in drafting the proxy statement, the acquiror had not *proposed* the misleading

---

[167] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 471 (Del. Ch. 2023), *rev'd*, 2025 WL 1693491 (Del. June 17, 2025) (quoting *RBC*, 129 A.3d at 862).

[168] *Id.* at 476.

[169] *Columbia Appellate Decision*, 2025 WL 1693491, at *23.

[170] *Id.* at *24.

statements specifically or suggested any omissions.[171] Thus, even active participation in the drafting process will not support a claim for aiding and abetting in disclosure breaches unless the acquiror produces the materially misleading portions of the disclosure.

*Mindbody* and *Columbia* collectively recalibrated the elements of a claim for aiding and abetting against a third-party acquiror. The message of these decisions rings loud and clear. As the high court said eight times in the two decisions, aiding and abetting liability is difficult to prove.[172] And although both *Mindbody* and *Columbia* were issued on appeal from post-trial decisions, they were intended to

---

[171] *Id.* at *35.

[172] *Id.*; *Mindbody Appellate Decision*, 332 A.3d at 391 ("As we said in *RBC*, 'the requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove.'") (quoting *RBC*, 129 A.3d at 865–66); *id.* ("In an M&A case, the role of the alleged aider and abettor in the transaction is important and can raise the level of difficulty of proving this already difficult claim to prove."); *id.* ("When an aiding and abetting claim is brought against a potential acquirer negotiating at arms'-length, participation should be the most difficult to prove."); *id.* at 402 ("As we explained above, when an aiding and abetting claim is brought against a third-party acquirer negotiating at arms'-length, participation should be the most difficult to prove."); *id.* at 404 ("An aiding and abetting claim, as explained above, is one of the most difficult claims to prove and requires a showing of both *scienter* and substantial assistance to the primary actor amounting to participation in that actor's breach."); *Columbia Appellate Decision*, 2025 WL 1693491, at *23 (citation omitted) ("As this Court recognized in *RBC Capital Markets, LLC v. Jervis* and reiterated recently in *Mindbody*, the requirement that an aider and abettor act knowingly—that is, with knowledge that the primary party's conduct constitutes a breach of fiduciary duty and that its own conduct is legally improper— 'makes an aiding and abetting claim among the most difficult to prove.'" (quoting *Mindbody Appellate Decision*, 332 A.3d at 391)); *id.* at *26 ("Our case law justifiably views with caution aiding-and-abetting claims against potential acquirors negotiating at arm's length. The dynamic of arm's-length negotiations, in which both sides are striving for the most favorable price, should render such claims 'the most difficult to prove.'" (quoting *Mindbody Appellate Decision*, 332 A.3d at 391)).

inform the elements applied at the pleading stage as well.[173]  Translating the high court's policy statements to a pleading-stage directive:  Aiding and abetting is difficult to plead.

Under this difficult test, Plaintiff's allegations fall short.  Plaintiff alleges that Microsoft exploited Kotick's conflicts arising from the Sexual Misconduct Issues. Microsoft publicly condemned the situation and stated that it was reevaluating its business relationships with Activision, thus putting pressure on Kotick and Activision.  Kotick contacted Spencer shortly after, and Microsoft promptly proposed an acquisition.  Plaintiff alleged that Kotick contacted Spencer about the Sexual Misconduct Issues and Microsoft's threat, and that Microsoft knew the allegations were putting pressure on Kotick and the Company's stock price that would make him eager to sell.

What Plaintiff fails to allege, however, is that Microsoft knew that Kotick was breaching his fiduciary duties, knew that making a bid under these circumstances was wrongful, and substantially assisted Kotick in his breach as opposed to passively creating the circumstances under which Kotick could breach his fiduciary duties. That Microsoft's CEO made himself available for a call with Kotick the day after Spencer and Kotick spoke, knew that Kotick may have been eager to sell, and negotiated directly with Kotick instead of the Board is not enough.  Nor are Plaintiff's allegations that Microsoft permitted the Board to rush the special meeting, facilitated

---

[173] *Mindbody Appellate Decision*, 332 A.3d at 392 (describing the holding as a source of protection to acquirors from the "high costs of discovery").

the Board's extension of the Merger Agreement, and offered Kotick material benefits such as having him remain as Activision CEO during the pendency of the Merger.

Plaintiff's allegations are less concerning than what the Delaware Supreme Court found insufficient in *Mindbody* and *Columbia*. The claim for aiding and abetting against Microsoft therefore fails.

So too with Plaintiff's claim for civil conspiracy. "Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter. . . ."[174] Plaintiff's failure to plead scienter as to Microsoft therefore defeats Plaintiff's claim for civil conspiracy.

Microsoft's motion to dismiss as to the aiding and abetting and conspiracy Merger Claims is granted.

## B. The Letter-Agreement Claims

Plaintiff claims that the Director Defendants breached their fiduciary duties by entering into the Letter Agreement and that Microsoft aided and abetted in those breaches. Plaintiff effectively argues that Kotick's conflicts, which tainted the sale process, also infected the process leading to the Letter Agreement. Plaintiff also seems to argue that the Board should have terminated the Merger Agreement and demanded payment of the Parent Termination Fee.

The decision to terminate or extend the termination date presented another fiduciary decision for the Board. That is because "[t]he directors of a Delaware corporation have a continuing obligation to discharge their fiduciary responsibilities,

---

[174] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038–39 (Del. Ch. 2006).

as future circumstances develop, after a merger agreement is announced."[175] When an opportunity for renegotiation arises, directors cannot "remain[] prisoners of their own misconceptions[.]"[176] At a minimum, enhanced scrutiny under *Revlon* governs the decision to enter into the Letter Agreement. And because there was no separate stockholder vote concerning the Letter Agreement, there is no possibility of *Corwin* cleansing.

It is reasonably conceivable that, rather than reevaluate the wisdom of the Merger Agreement, the Director Defendants chose to double down on their prior misconceptions and wrongful acts resulting in a Letter Agreement outside of the range of reasonable outcomes. According to Plaintiff, the Board met on July 17, 2023, the day before the July 18 drop-dead date. The FTC suit and CMA order meant that Activision could terminate the Merger Agreement under Section 8.1(c) and collect $3 billion from Microsoft. Instead, the Board approved the Letter Agreement, which kept Kotick in his job, extended Kotick and the Board's protections under the Merger Agreement and preserved the potential for the Merger to eliminate scandal-related lawsuits. The July 17, 2023 minutes reflect that Kotick alone negotiated the Letter Agreement with Microsoft. They also reflect that Activision did not explore its strategic alternatives but relied on Allen & Co.'s speculation that there was "no

---

[175] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003).
[176] *QVC*, 637 A.2d at 50.

reason to think" potential bidders would offer higher value.[177] These facts support an independent *Revlon* claim in connection with the Letter Agreement.

These facts also support a claim as to each director who approved the Letter Agreement under *Cornerstone*. It is reasonably conceivable that the same conflicts and mindset that allegedly tainted Board approval of the Merger Agreement infected the Director Defendants' actions when approving the Letter Agreement.

To the extent that Plaintiff claims damages for the Parent Termination Fee, however, the claim is dismissed. Any termination fee would have been paid to Activision. The failure to secure a termination fee, therefore, harms Activision. Thus, claims challenging the failure to secure a reverse termination fee are derivative.[178] Plaintiff lost standing to pursue a derivative claim on behalf of Activision when the Merger closed.[179] Plaintiff does not contend otherwise.

Additionally, Plaintiff has again failed to state a claim for aiding and abetting against Microsoft. Plaintiff argues that Microsoft knowingly participated in the Director Defendants' breach of fiduciary duties because the Letter Agreement is so one-sided. But Plaintiff does not plead the multiple levels of knowledge or substantial participation requires to state a claim for aiding and abetting. A third party

---

[177] Third Am. Compl. ¶ 528.

[178] *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035–36 (Del. 2004) (holding that claims for corporate loss are derivative).

[179] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021) ("[P]laintiff's standing is extinguished as a result of loss of plaintiff's status as a stockholder.").

negotiating a good deal for itself, standing alone, is not enough to support an inference that the third party knowingly or substantially participated in a fiduciary breach.[180]

The claim against Microsoft for aiding and abetting the Director Defendants' breach of fiduciary duties with respect to the Letter Agreement is dismissed.

## C.   The DGCL-Statutory Claims

The DGCL Claims consist of: the Committee-Dividend Claim based on Section 141(c) of the DGCL; the Appraisal Claim based on Section 262 of the DGCL; the Conversion Claims based on closing the Merger, filing the Merger Certificate, and signing the Merger Agreement; and the Treasury-Dividend Claims based on dividends issued on treasury shares.

### 1.   The Committee-Dividend Claim

Plaintiff alleges that the Board delegated to a committee the decision to approve a key financial term of the Merger Agreement—the amount of dividends the Activision stockholders would receive during the pendency of the Merger—in violation of Sections 141(c) and 251(b) of the DGCL.

Defendants moved to dismiss this claim previously, and the court denied that motion. In *Activision I*, the court held that the Dividend Provision (defined in *Activision I*) was a term of the Merger Agreement, it is reasonably conceivable that

---

[180] *See McGowan v. Ferro*, 2002 WL 77712, at \*3–4 (Del. Ch. Jan. 11, 2002) (dismissing claim that a third party aided and abetted a board's decision to extend the termination date of the merger agreement although the company had increased in value post-signing, noting that the third party was "entitled to bargain to obtain the best price for itself, and breached no duty by doing so, even if the result was a price that was unfairly low from the standpoint of [the target's] stockholders"); *see also Mindbody Appellate Decision*, 332 A.3d at 402.

70

the Board delegated approval of the Dividend Provision to an ad hoc committee, and delegating approval of the Dividend Provision to a committee violated Section 141(c).[181] That holding is the law of the case.[182]

Activision argues, however, that the court has not yet ruled on the Committee-Dividend "in its present state."[183] Although Activision does not expressly argue that the Letter Agreement and 2023 dividend mooted the Committee-Dividend Claim, that seems to be the gist of its argument. Plaintiff's allegations did not otherwise change materially from the Amended Complaint at issue in *Activision I*.[184] Plaintiff responds that the "2023 Dividend reduced damages and partially mooted the Dividend Claim, but that does not mean it entirely eliminated the Dividend Claim so there are 'no damages.'"[185]

---

[181] *Activision I*, 2024 WL 863290, at *9–10.

[182] *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

[183] Activision Reply Br. at 26.

[184] Other than minor grammatical edits, the only material changes made to Count I.B in the Second Amended and Supplemented Class Action Complaint were to add allegations that: Kotick negotiated the dividend term, which the ad hoc committee approved; the Proxy Statement, supplemental disclosure, and documents produced to Plaintiff "do not reflect that the ad hoc committee ever met and approved or executed a unanimous consent approving the dividend term"; and the invalid Merger Agreement contained an improper term on dividends that was not approved by the Board. (Dkt. 136, Ex. A ¶ 344 & n.282) These changes do not alter the court's analysis. There were no changes to Count I.B between the Second Amended and Supplemented Class Action Complaint and the Third Amended Complaint. *See* Dkt. 171, Ex. A ¶¶ 343–347.

[185] Pl.'s Ans. Br. at 46.

It seems theoretically possible that the 2023 dividend mooted all or aspects of the Committee-Dividend Claim. It is also possible the 2023 dividend merely mitigated damages that might flow from that claim. The court can look beyond the pleadings, typically, when evaluating whether an action mooted aspects of a claim.[186] In this case, however, Activision did not meaningfully develop the argument that the 2023 dividend mooted the Committee-Dividend Claim.[187] For present purposes, Defendants' motion to dismiss the Committee-Dividend Claim is denied without prejudice to Defendants' ability to argue later that the claim is moot.

### 2. The Appraisal Claim

Plaintiff claims that Defendants' failure to comply with Section 251 violated the Activision stockholders' appraisal rights under Section 262. Defendants move to dismiss this claim, arguing that Section 262 requires strict compliance with the requirements of Section 262 alone, not Section 251.

Section 262(a) provides that stockholders are entitled to appraisal "under the circumstances described in subsection (b) and (c) of this section."[188] Subsection (b) provides "[a]ppraisal rights shall be available . . . in a merger . . . to be effected

---

[186] *See Simon v. Navellier Series Fund*, 2000 WL 1597890, at *4 (Del. Ch. Oct. 19, 2000) (explaining that courts have flexibility "to consider evidence outside the pleadings" to resolve motions to dismiss).

[187] Activision focused on other arguments that were not terribly compelling. *See* Activision Reply Br. at 24–26.

[188] 8 *Del. C.* § 262(a). Section 262(c) authorizes a corporation to provide in its certificate that appraisal rights under Section 262 shall be available as a result of "any merger." Activision's certificate contained no such provision.

*pursuant to* § 251"[189] if stockholders are required to accept cash as merger consideration.[190] Quoting *Activision I*, Plaintiff argues that "pursuant to" is a restrictive phrase meaning in compliance or conformity with.[191] Compliance "means doing what is required."[192] Consequently, a merger is "effected pursuant to § 251" "if the agreement of merger conforms to the requirements of Section 251 and is approved in the way Section 251 requires."[193] Plaintiff reasons that when a merger subject to Section 251 does not comply with Section 251, then it has not been "effected pursuant to § 251," and it thus does not trigger appraisal rights under Section 262. Plaintiff concludes that by failing to comply with Section 251, Defendants deprived stockholders of their appraisal rights under Section 262.

Plaintiff puts too much emphasis on the word "effected," which does not support Plaintiff's conclusion. Section 262's reference to mergers "effected pursuant to § 251" describes what types of merger transactions do and do not give rise to Section 262 appraisal rights. And Section 261 itself contains the extensive list of requirements to perfect such rights. But Section 262 does not explicitly or implicitly incorporate Section 251's distinct requirements into the appraisal standards. Nor would such an interpretation further the purpose of Section 262 or Section 251. Whereas Section 251 sets out the basic statutory requirement for a merger or

---

[189] 8 *Del. C.* § 262(b) (emphasis added).

[190] *Id.* § 262(b)(2)(c).

[191] Pl.'s Ans. Br. at 52 (quoting *Activision I*, 2024 WL 863290, at *5).

[192] *Activision I*, 2024 WL 863290, at *5.

[193] *Id.*

consolidation, Section 262 is intended to afford stockholders the right to dissent and seek appraisal. There is no reason for lumping these independent provisions together.

Plaintiff correctly notes that Delaware law requires strict compliance of Section 262 by both stockholders and corporations.[194] Section 262 has been construed strictly to deny stockholders appraisal rights when a merger did not trigger such rights under the statute's terms.[195] In determining whether Defendants provided appraisal rights under Section 262, "fairness requires that the corporation be held to the same strict compliance with the appraisal statute as the . . . shareholders."[196] But the requirements of Section 262 with which stockholders and corporations must strictly comply are those delineated in Section 262, not the statutes Section 262 references. The rule of strict compliance does not help Plaintiff.

A failure to abide by Section 251 is problematic for other reasons as *Activision I* reflects, but it does not have the knock-on effects under Section 262 described by

---

[194] *In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 56 (Del. 2022).

[195] *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 57–59 (Del. Ch. 2011) (no Section 262 appraisal rights where merger allowing stockholders to elect merger consideration did not "require" them to accept cash); *City of N. Miami Beach Gen. Emps.' Ret. Plan v. Dr. Pepper Snapple Gp., Inc.*, 189 A.3d 188, 190–191, 195–203 (Del. Ch. 2018) (no Section 262 appraisal rights were triggered because Dr. Pepper was not a "constituent corporation" to a reverse triangular merger and Dr. Pepper stockholders were not required to relinquish their shares); *see also Nebel v. Sw. Bancorp, Inc.*, 1995 WL 405750, at *6 (Del. Ch. July 5, 1995) ("[O]ur law requires that the statutory mandate be strictly observed, and contemplates that any nonobservance will give rise to an appropriate remedy.").

[196] *Berger v. Pubco Corp.*, 976 A.2d 132, 144 (Del. 2009).

Plaintiff. Plaintiff has not alleged a violation of Section 262. The Appraisal Claim is dismissed.

### 3. The Conversion Claims

Plaintiff advances three theories of conversion, claiming that Activision and the Director Defendants converted the Class's stock through: the Merger; the filing of a false Merger Certificate in violation of Sections 103 and 251(c)(4); and the Merger Agreement.

Activision's lead argument for dismissal is that damages are a "necessary element" of a conversion claim and Plaintiff failed to plead damages under any of the three conversion theories.[197] Activision contends that the fair market value supplies the exclusive basis for damages in this context, and Plaintiff does not allege that the per-share price paid to Plaintiff at closing fell below the fair market value of the class's Activision shares. Activision advanced a version of this damages-must-be-pled argument previously, and the court rejected it, holding that Plaintiff's conversion-by-Merger theory stated a claim.[198] This is the law of the case.[199]

Plaintiff's theory of conversion based on the allegedly false filing is just a version of the conversion-by-Merger theory. In essence, Plaintiff argues that filing the Merger Certificate effected the invalid Merger that canceled each outstanding

---

[197] Activision Opening Br. at 26–29 (citing *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988); *Rockwell Automation, Inc. v Kall*, 2004 WL 2965427, at *4 (Del. Ch. Dec. 15, 2004)).

[198] *Activision I*, 2024 WL 863290, at *10.

[199] *Zirn*, 1994 WL 548938, at *2.

Activision share by converting it into the right to receive $95 in cash.[200] The act of conversion complained of under this theory is the same as that at issue in the conversion-by-Merger theory. It is reasonable that Activision's filing of the Merger Certificate constituted conversion of Plaintiff's and the Class's shares. Activision and the Director Defendants' motion to dismiss the claim of conversion based on the Merger Certificate is denied.

That leaves Plaintiff's theory of conversion based on the Merger Agreement. This theory does not repackage the other two. Rather, it introduces a new period into Plaintiff's conversion claim—the latency period between the signing of the Merger Agreement and the Merger. Plaintiff concedes that, during this period, Plaintiff still owned its shares of Activision stock and nothing prevented Plaintiff from selling those shares on the open market. So what was converted during this time, in Plaintiff's view? According to Plaintiff, Activision and the Director Defendants impermissibly exercised dominion over *rights* associated with stock ownership.

Plaintiff argues that, to state a claim of conversion over stock, "[a]n actual taking of the stock is not required" and that "[r]estriction of the rights and powers of stock causes harm, even though the stock was not taken or destroyed."[201] And that is true in some circumstances, such as where a corporation fails to register shares or

---

[200] Pl.'s Ans. Br. at 68.

[201] Pl.'s Ans. Br. at 71 (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933); *Mastellone v. Argo Oil Corp.*, 76 A.2d 118, 120 (Del. Super. 1950)).

to issue record shares to a beneficial owner rendering the holder unable to sell the stock during the period of conversion.[202]

In contrast, Plaintiff fails to identify any way in which—until the time of the Merger—the Merger Agreement restricted Plaintiff's rights as a stockholder. Plaintiff cites to restrictions in the Merger Agreement, but those restrictions all apply to Activision alone. For example, Plaintiff points to the forbearance covenants[203] and the non-solicitation provisions.[204] But those provisions restrict the Company, not its stockholders.[205] Moreover, the provisions of the Merger Agreement on which Plaintiff relies contain exceptions for actions required by applicable law and are only enforceable to the extent permitted by law.[206] If the provisions of the Merger

---

[202] *See Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609 (S.D.N.Y. 1977) (inferring that the holder "would have wished to dispose of its" stockholders during the period of conversion); *Loretto Literary & Benev. Inst. v. Blue Diamond Coal Co.*, 444 A.2d 256, 259–60 (Del. Ch. 1982) (denying an award of damages where the delayed registration did not affect the stockholder's ability to exercise its rights in any legally cognizable way); *accord Am. Gen. Corp. v. Cont'l Airlines Corp.,* 622 A.2d 1, 10 (Del. Ch. 1992), *aff'd*, 620 A.2d 856 (Del. 1992) ("The hallmark of conversion cases is the interference with the plaintiff's ability to transfer securities he owns or to which he is entitled. The injury that the plaintiff suffers is the deprivation of his range of elective action, and by applying the conversion measure of damages a court endeavors to restore that range of elective action.").

[203] Merger Agr § 5.2.

[204] Merger Agr. § 5.3.

[205] *See, e.g.*, Merger Agr. § 5.2 (stating that "the Company will not"); *id.* § 5.3(a) (stating that "the Company will cease"). Plaintiff contends that this is a distinction "without a difference." Pl.'s Ans. Br. at 76. According to Plaintiff, "for transactions that require both board and stockholder approval, prohibiting Activision from engaging in such transactions effectively prevents stockholders from even getting to consider such transactions." *id.* But stockholders' rights are always limited in this way as to transactions that require both board and stockholder approval.

[206] Activision Opening Br. at 38 (citing Merger Agr. at 9, 56).

77

Agreement impermissibly restricted the rights of non-parties to the agreement, therefore, they are unenforceable.[207]

Because Plaintiff has failed to identify any rights impaired by merely signing the Merger Agreement, Plaintiff fails to support its theory of conversion by Merger Agreement.

### 4.    The Treasury-Dividend Claims

Plaintiff's Treasury-Dividend Claims are especially complicated.  Plaintiff alleges that Defendants violated the DGCL and Activision's Certificate of Incorporation, and acted contrary to the Board's own resolution, by paying dividends on treasury shares.

Plaintiff's theory is that, when Activision issued the $0.99 per share dividend to stockholders, the Board paid approximately $424 million of dividends on the Amber shares.  Had the total dividend payment of $1.2 billion excluded Amber treasury stock, then the per-share payment to outstanding common stockholders would have been $1.52.  Plaintiff further claims that the Board issued the illegal dividend knowingly in violation of their fiduciary duties.

According to Plaintiff, the Amber dividend is problematic as a matter of law in many ways.  The Amber shares were treasury shares—issued but not outstanding.[208]

---

[207] Plaintiff's allegations that some provisions of the Merger Agreement are invalid does not invalidate the entire contract.  The Merger Agreement's carve out for DGCL violations is a standard and valid provision on which the Defendants can rely.

[208] *See Atterbury v. Consol. Coppermines Corp.*, 20 A.2d 743, 747 (Del. Ch. 1941) (outstanding stock means "stock in the hands of shareholders, not stock in the treasury").  Adding further confusion, the Board resolution authorizing the dividend ordered that it be paid to "outstanding" stock, although it also mentioned Amber

Issuing dividends on treasury shares means that the dividends go into the company coffers, which is not generally how dividends are supposed to work.[209] And dividends *cannot* work that way, according to Plaintiff: "Treasury shares do not have dividend rights."[210]

In fact, Plaintiff says that the Company's Certificate of Incorporation and Sections 170 and 173 of the DGCL combined prohibit paying dividends on treasury shares. Although neither the DGCL nor the Certificate includes language stating as much, Plaintiff argues that they operate to prohibit dividends on treasury shares.

Activision moved to dismiss this claim on both factual and legal grounds. As a factual matter, Activision contends that prior dividends were paid on the Amber shares, Microsoft was unaware that dividends were paid to treasury shares, and that the Amber shares were a "hook stock" with tax and other implications.[211] Activision further argues that common stockholders were not entitled to a pro rata

---

shares. Third Am. Compl. ¶ 565. And Activision stated in its public disclosure that the dividend was on Activision's "outstanding common stock." *Id.* ¶¶ 565, 570–573, 579–585. Although the resolution expressly mentioned the Amber shares, treasury stock is "issued" but not "outstanding."

[209] *See Lynam v. Gallagher*, 526 A.2d 878, 882 (Del. 1987) ("A cash dividend is the corporate distribution of cash assets to its stockholders from the profits or surplus assets of the corporation."). "A cash dividend reduces the net assets of the corporation and transfers that amount of cash to its stockholders. Therefore, a cash dividend severs a portion of the corporation's profits from the corporation and its stockholders receive a present return on their investment in the form of cash." *Id.* (citation omitted).

[210] Pl.'s Ans. Br. at 204 (citing James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 21:9 (3d ed. Nov. 2023 Update); Ellisa Opstbaum Habbart, Samuel A. Nolen & Steven A. Cohen, *United States: Treasury Shares* (2012)).

[211] *See* Activision Opening Br. at 14–15 & n.15, 47 & n.27, 51–52.

portion of the total $1.2 billion payment—the Board declared a dividend of up to $0.99 per share, not a proportionate amount of $1.2 billion.[212]

As a legal matter, Activision denies that the DGCL prohibits companies from issuing dividends on treasury stock. According to Activision, no Delaware case cited by Plaintiff holds that corporations cannot issue dividends to stock not deemed "outstanding."[213] Corporations can and do pay dividends on treasury stock due to certain tax law considerations.[214] And tax regulations accounting for this scenario further evidence its legality.[215]

The parties' disputes over the facts and the law governing the Treasury-Dividend Claims could generate one full 80-plus page decision on their own. But it is good to remember that this is a pleading-stage decision. Defendants' factual arguments warrant converting this aspect of their motion into one for summary judgment. And the parties' legal arguments concerning the treasury dividends warrant a deeper dive, potentially helped by expert witnesses on the nuances of the

---

[212] *See Gabelli & Co., Inc. v. Liggett Gp. Inc.*, 479 A.2d 276, 280 (Del. 1984) ("It is settled law in [Delaware] that the declaration and payment of a dividend rests in the discretion of the corporation's board of directors in the exercise of its business judgment[.]"); *Baron v. Allied Artists Pictures Corp.*, 337 A.2d 653, 658–59 (Del. Ch. 1975) ("The determination as to when and in what amounts a corporation may prudently distribute its assets by way of dividends rests in the honest discretion of the directors in the performance of this fiduciary duty.").

[213] Activision Opening Br. at 51–52.

[214] *Id.* (citing Jasper L. Cummings, Jr., *Let Us Demystify Hook Stock*, 147 Tax Notes 1155, 1159, 1169 (2015)).

[215] *Id.* (citing 26 C.F.R. § 1.1502-13 (regulations governing intercompany transactions)).

issue.  For these reasons, this aspect of the motion to dismiss is converted to a motion for summary judgment under Rule 56.[216]

### D. The DGCL-Fiduciary Claims

Plaintiff claims that Kotick and the Director Defendants breached their fiduciary duties by violating the DGCL or causing Activision to do so.  To plead a non-exculpated claim, Plaintiff must allege facts to support an inference that a director acted in bad faith or engaged in "intentional misconduct or a knowing violation of the law."[217]  Directors are presumed to know the law.[218]  And Plaintiff has adequately alleged that the Director Defendants violated many DGCL provisions in a rush to approve the Merger.[219]  According to Plaintiff, this is enough to hold the Director Defendants liable for the DGCL violations.

The Director Defendants advance a host of arguments for why Plaintiff's DGCL-Fiduciary Claims fail.  One resonates quite clearly.  As to this category of conduct, Plaintiff fails to plead a reasonably conceivable inference of bad faith.  Delaware law distinguishes between flawed efforts and intentional wrongdoing.[220]  Plaintiff does not plead facts from which one could infer that the hyper-technical

---

[216] *See Acero Cap., L.P. v. Swrve Mobile*, Inc., 2021 WL 2207197, at *3 (Del. Ch. June 1, 2021) (converting Rule 12(b)(6) motion into motion for summary judgment); *Raj & Sonal Abhyanker Family Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *9 (Del. Ch. June 17, 2021) (same).

[217] 8 *Del. C.* § 102(b)(7)(ii).

[218] *See, e.g., Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 629 (Del. Ch. 2005), *aff'd in part, rev'd in part*, 901 A.2d 106 (Del. 2006).

[219] *See* Legal Analysis *supra*, § A.1.

[220] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *7 (Del. Ch. June 30, 2014).

DGCL violations at issue in this case were anything more than flawed efforts. Even if it is reasonably conceivable that the Director Defendants were motivated for the wrong reasons to move quickly in the sale process, it is not reasonably conceivable based on the facts alleged that they knowingly violated the DGCL when doing so.

The DGCL-Fiduciary Claims are dismissed.

## III.  CONCLUSION

Defendants' motions to dismiss are granted as to Counts I.D (the Appraisal Claim), II.B (the Conversion-by-Merger Agreement Claim), III.B and IV.B (the DGCL-Fiduciary Claims), V (the Merger Claims against Microsoft), and VI (the Letter Agreement Claims against Microsoft). Defendants' motion to dismiss Counts VII and VIII (the Treasury-Dividend Claims) are converted to a motion for summary judgment. The motions to dismiss are otherwise denied.